198 P.3d 615

COUNTY OF HAWAI'I, a municipal corporation, Plaintiff/Counterclaim Defendant–Appellee

v.

C & J COUPE FAMILY LIMITED PARTNERSHIP, Defendant/Counterclaimant–Appellant

and

Robert Nigel Richards, Trustee Under The Marilyn Sue Wilson Trust; Miles Hugh Wilson; John Does 1–100; Jane Does 1–100; Doe Partnerships 1–100; Doe Corporations 1–100; Doe Entities 1–100; And Doe Governmental Units 1–100, Defendants.

C & J Coupe Family Limited Partnership, Third–Party Plaintiff–Appellant

v.

1250 Oceanside Partners aka Hokuli'a, Third–Party Defendant–Appellee (Civ. No. 00-1-0181K).

County of Hawai'i, a municipal corporation, Plaintiff/Counterclaim Defendant–Appellee

v.

C & J Coupe Family Limited Partnership, Defendant/Counterclaimant/Cross Claimant–Appellant

and

1250 Oceanside Partners Aka Hokuli'a, Defendant/Cross Claim Defendant–Appellee

and

Robert Nigel Richards, Trustee Under The Marilyn Sue Wilson Trust; Miles Hugh Wilson; John Does 1–100; Jane Does 1–100; Doe Partnerships 1–100; Doe Corporations 1–100; Doe Entities 1–100; and Doe Governmental Units 1–100, Defendants (Civ. No. 05-1-015K).

No. 28822.

Supreme Court of Hawai'i.

Dec. 24, 2008.

Robert H. Thomas, Honolulu (Kenneth R. Kupchak, Mark M. Murakami, and Christi-Anne H. Kudo Chock with him on the briefs) (Damon Key Leong Kupchak Hastert), for appellant, C & J Coupe Family Limited Partnership.

Joseph K. Kamelamela, Hilo (Michael J. Udovic, Ivan M. Torigoe, and Katherine A. Garson with him on the briefs) Deputies Corporation Counsel, County of Hawai'i, for appellee County of Hawai'i.

William Meheula, Honolulu (Winer, Meheula & Devens), for appellee 1250 Oceanside Partners aka Hokuli'a.

NAKAYAMA, ACOBA, and DUFFY, JJ.; with MOON, C.J., concurring separately and dissenting, with whom LEVINSON, J., joins.

Opinion of the court by ACOBA, J.

This case arises from two condemnation actions brought by Plaintiff–Appellee County of Hawaii (Appellee or the County). In both actions Appellee sought to condemn property belonging to Defendant–Appellant C & J Coupe Family Limited Partnership (Appellant) [1] for use as a public highway (Bypass).[2] 1250 Oceanside Partners (Oceanside), a development company that was to build the Bypass through an agreement with Appellee, was added in Civ. No. 00–1–0181K (Condemnation 1) as a Third–Party Defendant and, therefore, is the Third–Party Defendant–Appellee in the appeal in that case. Oceanside was ordered joined as a defendant on indispensable party grounds in Civ. No. 05–1–015K (Condemnation 2) and, therefore, is the Defendant–Appellee in the appeal from that case. The court consolidated the cases and dismissed Condemnation 1 in favor of Appellant but granted condemnation in Condemnation 2, entering judgment in favor of Appellee and Oceanside on September 27, 2007. Oceanside joined Appellee in its answering brief on appeal and, therefore, is bound by the resolution herein of the issues raised.

Appellant appeals from (1) the automatic denial by operation of law of Appellant's post-judgment motion for statutory damages pursuant to HRS § 101–27 (1993) [3] in Con-

---

1. The complaints were initially filed against Robert Nigel Richards, Trustee Under the Marilyn Sue Wilson Trust; Robert Nigel Richards, Trustee Under the Joan Elizabeth Coupe Trust; Charles William Coupe; Joan Elizabeth Coupe; Miles Hugh Wilson; Joan Coupe, Trustee under Revocable Trust of Joan Coupe Dated March 30, 1989, and unidentified defendants. All named defendants except Robert Nigel Richards, Trustee Under the Marilyn Sue Wilson Trust, and Miles Hugh Wilson answered the complaints. On May 23, 2007, the parties stipulated to substitute C & J Coupe Family Limited Partnership for the foregoing named defendants who appeared in the two cases. Therefore, these said named defendants are hereafter referred to as "Appellant."

2. This case is before us by virtue of our acceptance of a request filed by Appellee for transfer from the Intermediate Court of Appeals (the ICA), pursuant to Hawaii Rules of Appellate Procedure (HRAP) Rule 40.2 (2008) and Hawai'i Revised Statutes (HRS) § 602–58 (Supp.2007).

HRS § 602–58 entitled "Application for transfer to the supreme court," states in part as follows:

> (a) The supreme court, in the manner and within the time provided by the rules of court, shall grant an application to transfer any case within the jurisdiction of the intermediate appellate court to the supreme court upon the grounds that the case involves:
> (1) A question of imperative or fundamental public importance;
> . . . .
> (b) The supreme court, in the manner and within the time provided by the rules of court, may grant an application to transfer any case within the jurisdiction of the intermediate appellate court to the supreme court upon the grounds that the case involves:
> (1) A question of first impression or a novel legal question; or
> (2) Issues upon which there is an inconsistency in the decisions of the intermediate appellate court or of the supreme court.

3. HRS § 101–27 is quoted in its entirety *infra* at pages 360–61, 198 P.3d at 624–25.

demnation 1 and (2) the September 27, 2007 First Amended Final Judgment of the Circuit Court of the Third Circuit (the court)[4] in favor of Appellee in Condemnation 2. Related to the court's judgment dismissing Condemnation 1, Appellant argues that it was entitled to statutory damages under HRS § 101–27 because "[Appellee] did not succeed in taking the property in that case." Related to Condemnation 2, Appellant argues that (1) the court lacked subject matter jurisdiction under the doctrine of abatement, and (2) if the court had subject matter jurisdiction, it erred in failing to consider whether the asserted public purpose was a pretext for private benefit. On appeal, Appellant asks this court to (1) remand Condemnation 1 for an award of damages,[5] and (2)(a) reverse the court's Judgment in Condemnation 2 for lack of jurisdiction, or, in the alternative, (b) vacate the Judgment in Condemnation 2 and remand for determination of whether the asserted public purpose was pretextual.

 We hold that (1) a landowner in a condemnation action is entitled to damages under HRS § 101–27 where the property at issue is not finally taken in the context of a particular condemnation proceeding, irrespective of whether the government attempts to take the land through subsequent condemnation proceedings; (2) abatement does not apply where the relief sought in two concurrent actions is not the same; and (3) although our courts afford substantial deference to the government's asserted public purpose for a taking in condemnation proceeding, where there is evidence that the asserted purpose is pretextual, courts should

consider a landowner's defense of pretext. Therefore, (1) automatic denial of statutory damages under HRS § 101–27 in Condemnation 1 is vacated and the case remanded for a determination of damages, (2) the court's conclusion that Condemnation 2 was not abated by Condemnation 1 is affirmed, and (3) the court's Judgment in Condemnation 2 is vacated and the case remanded for a determination of whether the public purpose asserted in Condemnation 2 was pretextual.

## I.

This case arises from the development of the Hokuli'a subdivision (Hokuli'a) by Oceanside. The project is located on a 1550–acre parcel, which extends from the ocean almost to the Māmalahoa Highway, and crosses the border between North and South Kona on the Island of Hawai'i. Appellant's property is contiguous to the southern border of Hokuli'a. It appears that the zoning of the 1550–acre parcel did not allow for the planned Hokuli'a development.[6] Thus, the Hawai'i County Council (HCC) passed Ordinances 96–7 and 96–8, which, in pertinent part, rezoned the Hokuli'a land. As a condition of rezoning, Oceanside agreed to construct a Bypass in the vicinity of Keauhou and Captain Cook. According to Appellee, the Bypass is necessary to "alleviat[e] unacceptable and unsafe traffic conditions."

Appellant characterizes the Bypass as a means of accessing the Hokuli'a development from the existing infrastructure, i.e., Māmalahoa Highway. It maintains that Oceanside agreed, as a condition of rezoning, to "construct a road to connect its property to Mam-

---

4. The Honorable Ronald Ibarra presided.

5. Because, as explained below, the requested damages were deemed denied by operation of law when the court failed to rule on the request within the prescribed time period, there is no order or judgment to dispose of related to the appeal in Condemnation 1. The Judgment dismissing Condemnation 1 is not challenged by Appellant's first issue on appeal. In that connection, Appellant notes that Appellee has not appealed from the dismissal of Condemnation 1, the period to appeal pursuant to HRAP Rule 4(a)(1) (2008) has expired, and, therefore, the Judgment in Condemnation 1 is final and cannot now be appealed. *See Bacon v. Karlin*, 68 Haw. 648, 651, 727 P.2d 1127, 1130 (1986) (holding

that the failure to file a notice of appeal within the time provided in HRAP Rule 4(a)(1) deprived this court of appellate jurisdiction.)

6. The parties do not state how the land was originally zoned, and what category was needed to allow for Hokuli'a to be developed. This court need not search through a voluminous record, which in this case includes thousands of pages in each condemnation action, for details not provided. *Cf. Lanai Co., Inc. v. Land Use Comm'n*, 105 Hawai'i 296, 309 n. 31, 97 P.3d 372, 385 n. 31 (2004) (explaining that this court "is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions" (citations omitted)).

alahoa Highway." [7] Further, Appellant represents that, under this condition, Oceanside was responsible for acquiring the property necessary for the Bypass and for the cost of constructing the Bypass. Contrastingly, Appellee states that, because the Bypass would cross many parcels of privately-owned land, "the [rezoning] ordinances anticipated that [Appellee] might need to use its eminent domain power in connection with the construction of the Bypass." Paragraph 14 of the Development Agreement requires Oceanside to dedicate the Bypass to Appellee upon its completion. Thereafter, Appellee will "assume all responsibility and costs for operation, maintenance, repair, or reconstruction of the [Bypass]."

In April of 1998, the HCC passed Resolution 244–98 adopting the Development Agreement between Appellee and Oceanside. Appellant presents the portions of the Development Agreement following as salient. First, Oceanside was authorized to determine the route of the Bypass and, thus, which property needed to be acquired.

Oceanside shall:

. . . .

(2) Determine the final ... alignment of the entire [Bypass], including intersection areas.

(Capitalization omitted.) Relatedly, Paragraph 10 provided for the exercise of Appellee's eminent domain power if Oceanside could not obtain the land necessary for the Bypass through private sale.

Oceanside shall attempt to negotiate a purchase price with any and all persons. Should Oceanside and any person be unable to negotiate a mutually agreeable purchase price, then Oceanside shall provide [a list of appraisers, from which the landowner must choose one appraiser and accept the price established by the appraiser]. Should Oceanside and the person be unable to select an appraiser or if the person and Oceanside cannot decide on a price recommended by [a] mutually selected appraiser, then upon written request to the Mayor, [Appellee] shall be required to use its condemnation powers to acquire

the segment(s) from the person pursuant to Paragraph (11).

(Emphases added.) (Capitalization omitted.) The Development Agreement also allowed for the institution of condemnation proceedings in the absence of negotiations, where the landowner refused to consider selling his or her land to Oceanside.

Notwithstanding Paragraph (10.b), if the person fails to participate in negotiations with Oceanside for the purchase of segment(s) of the [Bypass] from the person despite Oceanside's good faith attempts to negotiate, then Oceanside may, in its sole discretion submit a letter to the Mayor to have [Appellee] utilize its condemnation powers. Upon receipt of the written request [Appellee] shall be required to use its condemnation powers to acquire the segment(s) from the person pursuant to Paragraph (11).

(Emphases added.) (Capitalization omitted.) Second, Paragraph 11 of the Development Agreement established that (1) condemnation actions would be initiated upon Appellee's receipt of a notice of requirement from Oceanside, (2) Oceanside had sole discretion to determine what property to condemn, and (3) Oceanside would reimburse Appellee for any costs incurred as a result of the condemnation proceedings.

Should the person fail to participate in negotiations with Oceanside ..., the condemnation powers of [Appellee] shall be required for the acquisition of the segment(s).

a. Upon Oceanside's tender of a requirement of condemnation by letter to [Appellee], [Appellee] shall within thirty (30) days begin to immediately and expeditiously exercise the same pursuant to HRS chapter 101. Oceanside's tender of such requirement of condemnation to [Appellee] shall constitute a "formal initiation of condemnation action" as that term is used in Condition L(2) of Ordinance 96–8 and Condition M(2) of Ordinance 96–7 and shall relieve Oceanside of all further liabili-

---

**7.** It seems that the Bypass referred to by Appellee and the access road referred to by Appellant is, in fact, the same road. Therefore, for the sake of consistency, "Bypass" is used throughout.

ty or obligation to purchase segment(s) of the [Bypass] from such person.

b. *[Appellee] shall submit to Oceanside a written request for payment of any and all reasonable costs and expenses incurred by [Appellee]* for the acquisition of the condemned land in conjunction with [Appellee's] exercise of its condemnation powers *when Oceanside has determined in its sole and absolute discretion that there is a need for possession or in the event that a court orders payment for the acquired land.* Within forty-five (45) days of written notice from [Appellee], *Oceanside shall reimburse [Appellee] for any and all reasonable costs and expenses incurred by [Appellee]* for the acquisition of the condemned land in conjunction with [Appellee's] exercise of its condemnation powers.

(Emphases added.) (Capitalization omitted.) Third, once all the required land was acquired, Oceanside would be responsible for constructing the Bypass. "Oceanside shall construct the [Bypass] to the standards set forth in Exhibit 'M' by the Department of Public Works for Alii Highway with such modifications as may be deemed necessary by the County Department of Public Works and by Oceanside." (Capitalization omitted.)

Oceanside initially attempted to obtain Appellant's property through a private sale. Appellee relates that "[s]tarting in 1997, Oceanside and [Appellee] engaged in negotiations with [Appellant] to obtain the right-of-way needed to construct the Bypass through [its] property. However, despite lengthy negotiations, Oceanside and [Appellee] were unable to reach an agreement with [Appellant] and they eventually reached an impasse in 2000." Being unable to negotiate a sale, on May 23, 2000, Oceanside sent a letter to Appellee requesting that it exercise its power of eminent domain with respect to Appellant's land. After receiving the request, Appellee started the necessary procedures, and on July 26, 2000, the HCC adopted Resolution No. 266-00, finding it necessary for Appellee to initiate eminent domain proceedings against Appellant's land pursuant to the Development Agreement, Oceanside having been unable to acquire the right-of-way for the Bypass. That resolution read:

Whereas, the [D]evelopment [A]greement provides that if one of the owners across whose property the [Bypass] is planned to traverse fails to mutually agree with Oceanside with respect to the purchase price or "the terms of the purchase," the condemnation powers of [Appellee] shall be used to acquire that particular segment with Oceanside reimbursing [Appellee] for any costs to acquire.

Pursuant to that Resolution, on October 9, 2000, Appellee filed a condemnation complaint, thereby initiating Condemnation 1. Both Resolution No. 266-00 and the October 2000 Complaint attached a survey identifying the parcel to be condemned, which comprised an area of 2.9 acres. On October 9, 2000, Appellee also filed an "Ex Parte Motion for Order Putting [Appellee] in Possession" pursuant to HRS § 101-29 (1993), which was granted on October 10, 2000.

On January 24, 2001, Appellant filed its Answer to Appellee's October 9, 2000 Complaint and a Counterclaim against Appellee. Appellant's Answer asserted eleven defenses and the counterclaim raised four claims for relief.

On September 4, 2001, in Condemnation 1, Appellee filed a "Motion for Partial Summary Judgment as to [Appellant's] Sixth and Seventh Affirmative Defenses and First Claim for Relief Asserted in the Answer and Counterclaim Filed January 24, 2001" (Motion for Partial Summary Judgment). Appellant's sixth affirmative defense was that there "is no public necessity for the taking." In that connection, the seventh affirmative defense was that Condemnation 1 did not have a valid public purpose, but was being effected "for private benefit." Similarly, the first claim for relief in the counterclaim alleged that the taking was instituted "for the private benefit of Oceanside," in violation of the public purpose clauses of the federal and state constitutions. On November 27, 2001, the court granted Appellee's Motion for Partial Summary Judgment.

According to Appellee, relevant to the subsequent Condemnation 2 action, on February 21, 2002, Appellee issued a "final subdivision

approval for the Bypass."[8] Although Condemnation 1 had sought only 2.9 acres of Appellant's property, the final subdivision approval indicated that 3.348 acres of Appellant's property would be needed for the Bypass.

In July of 2002, the court held a hearing on the issue of public purpose and, after considering the evidence, on September 5, 2002, reversed its November 27, 2001 Order granting partial summary judgment to Appellee, finding that there was a genuine issue of material fact as to public purpose. Upon motion by Appellant, on December 11, 2002, the court thereby stayed the order putting Appellee in possession of Appellant's property until final judgment.

According to Appellant, possession was subsequently returned to Appellant and the construction of the Bypass "halted." Thereafter, Oceanside sought a writ of mandamus directing Judge Ibarra to rescind his sua sponte order transferring Oceanside's motion for disqualification or recusal of Judge Ibarra, and its motion for stay of proceedings, to Judge Amano, which this court denied on April 10, 2003. *See County of Hawai'i v. Richards*, No. 25746, 2003 WL 1961471 (Apr. 10, 2003) (unpublished order).

According to Appellant, at trial, in Civil No. 00–1–181K,[9] it opposed Condemnation 1, arguing, *inter alia*, that (1) Appellee "illegally delegated its power of eminent domain to Oceanside," (2) "the claimed public use was a pretext," and (3) "the taking was not for a public use or purpose[, n]or was it an exercise of [Appellee's] independent discretion." It also objected to the reimbursement provisions of the Development Agreement, "maintain[ing] that the Development Agreement attempted to shift Oceanside's obligation to pay for its road to third parties, whether or not their land was being taken." Pursuant to the Development Agreement, these third parties may include "developers or land owners" who Appellee determined as benefitting from construction of the Bypass.

For unstated reasons, during the pendency of Condemnation 1, Appellee for a second time initiated procedures to condemn Appellant's property. On January 23, 2003, the HCC adopted Resolution No. 31–03. That resolution

authoriz[ed Appellee] to initiate a second eminent domain proceeding for condemnation of [Appellant's] property for the Bypass. Unlike Resolution [No.] 266–00 this resolution did not reference the Development Agreement and instead the [HCC] determined that the Bypass [would] provide "a regional benefit for the public purpose and use which will benefit the County [of Hawai'i]."

On January 28, 2005, Appellee filed a second condemnation action against Appellant pursuant to the Resolution. In accord with the final subdivision approval, both Resolution No. 31–03 and Appellee's Complaint in Condemnation 2 sought to condemn approximately 3.348 acres of Appellant's land.

On February 7, 2005, Appellant filed a Motion to Dismiss or in the Alternative to Consolidate with Condemnation 1. Based on that motion, on March 31, 2005, the court consolidated Condemnation 1 and Condemnation 2.

A bench trial took place over the course of sixteen days in July and August, 2007. Appellant asserts that throughout the proceedings related to Condemnation 2, it repeatedly argued that the court did not have subject matter jurisdiction over the matter because Condemnation 2 was abated by the pendency of Condemnation 1.

As to Condemnation 1, on September 27, 2007, the court determined that it was invalid because Appellee had "illegally delegated its power of condemnation, through the Development Agreement, to a private party, [Oceanside], and therefore did not have a proper public purpose." In that connection, the court ordered that judgment be entered against Appellee and in favor of Appellant as follows:

---

8. It should be noted that, at that time, Appellee had not yet initiated Condemnation 2.

9. As noted *infra* at page 359, 198 P.3d at 623, on March 31, 2005, the court ordered Condemnation 1 and Condemnation 2 to be consolidated.

The Condemnation is invalid. *Judgment is hereby ordered to be entered in favor of [Appellant] and against [Appellee] because [HCC] Resolution [No.] 266–00 illegally delegated [Appellee's] power of condemnation, through the Development Agreement, to a private party, [Oceanside],* and therefore did not have a proper public purpose.

(Emphasis added.) As to Condemnation 2, the court ruled (1) that it was not abated and (2) that it was for a public purpose. Relatedly, the Judgment declares that

> [t]here is no abatement. Judgment is hereby entered in favor of [Appellee] and [Oceanside], and against [Appellant] because *the claims are substantially different, based on different resolutions that were passed by separate and different County Councils over four years apart, pray for different relief and do not fall under the doctrine of abatement.*

(Emphasis added.)

On October 11, 2007, Appellant filed a request for statutory damages consisting of attorneys' fees and costs (fees motion) pursuant to HRS § 101–27 "because [its] property was not taken for public use" in Condemnation 1. On October 26, 2007, Appellant appealed from the Judgment in Condemnation 2. The court did not rule on the fees motion by January 9, 2008, and, therefore, as related by Appellant, it "was deemed denied by operation of [HRAP Rule] 4(a)(3) [ (2008) ], which requires that [the court] . . . dispose[ ] of the motion within [ninety] days." On February 8, 2008, Appellant appealed from this denial of the fees motion.

On June 16, 2008, Appellee filed a motion for transfer to this court pursuant to HRAP Rule 40.2 and HRS § 602–58(a)(1). On June 23, 2008, Appellant filed its opposition to transfer. On July 9, 2008, this court accepted transfer. On October 16, 2008, this court heard oral argument on the merits.

## II.

Appellant presents three questions on appeal. The first pertains to Condemnation 1 and the others to Condemnation 2. First, related to its fees motion, Appellant asks,

"May [Appellee] forever avoid its obligation under [HRS] § 101–27 to pay damages for discontinued or failed takings by instituting serial condemnation actions?" In connection with this question, Appellant asserts that because its property was not taken in Condemnation 1, the court was required to award "all such damages as may have been sustained . . . by reason of the bringing of the [condemnation] proceeding . . . including [its] costs of court, a reasonable amount to cover attorney's fees paid by [it] in connection therewith, and other reasonable expenses." (Quoting HRS § 101–27.) (Emphases omitted.) Second, related to the issue of abatement, Appellant asks:

> Is an eminent domain action abated—and the circuit court deprived of subject matter jurisdiction—when the court is already considering another, earlier-filed eminent domain action, instituted by the same plaintiff, in the same court, against the same defendants, for the same relief?

As to this question, Appellant further maintains that, in Condemnation 2, the court "lacked subject matter jurisdiction, and [it] erred when it denied multiple motions to dismiss." Third, in connection with the Judgment in Condemnation 2, Appellant asks:

> Does a circuit court have any duty under the [United States] and Hawai'i Constitutions to examine the record to determine whether the government's proffered public purpose supporting a taking is a pretext hiding a predominantly private benefit, or may it simply take the government's word?

Related to this question, Appellant further posits that "[the court] should not have rejected allegations of a pretextual taking or predominantly private purpose by looking only to the government's claims of public use."

## III.

As discussed *infra,* Appellant is entitled to seek statutory damages pursuant to HRS § 101–27 because it prevailed in Condemnation 1. HRS § 101–27 provides:

> *Whenever* any proceedings instituted under this part are abandoned or discontinued before reaching a final judgment, or if,

for any cause, *the property concerned is not finally taken for public use, a defendant who would have been entitled to compensation or damages had the property been finally taken, shall be entitled, in such proceedings, to recover from the plaintiff all such damage as may have been sustained by the defendant by reason of the bringing of the proceedings and the possession by the plaintiff of the property concerned if the possession has been awarded including the defendant's costs of court, a reasonable amount to cover attorney's fees paid by the defendant in connection therewith, and other reasonable expenses;* and the possession of the property concerned shall be restored to the defendant entitled thereto. Issues of fact arising in connection with any claim for such damage shall be tried by the court without a jury unless a trial by jury is demanded by either party, pursuant to the rules of court, within ten days from the date of the entry of an order or judgment allowing the discontinuance of the proceedings, or dismissing the proceedings or denying the right of the plaintiff to take the property concerned for public use. In the event judgment is entered in favor of the defendant and against the plaintiff, any moneys which have been paid, and any additional security which has been furnished, by the plaintiff to the clerk of the court under sections 101–28 and 101–29, shall be applied or enforced toward the satisfaction of the judgment. In the case of the State or a county, if the moneys so paid to the clerk of the court are insufficient, then the balance of such judgment shall be paid from any moneys available or appropriated for the acquisition of the property concerned, or if that is insufficient then the same shall be paid from the general fund of the State or county, as the case may be.

(Emphases added.)

▐ Whether Appellant was entitled to damages presents an issue of statutory interpretation, which this court reviews *de novo.* *State v. Bayly,* 118 Hawai'i 1, 6, 185 P.3d 186, 191 (2008) (stating that "[s]tatutory interpretation is a question of law reviewable *de novo* " (internal quotation marks and citations omitted)). Under the canons of statutory construction, "where the language of the law in question is plain and unambiguous courts must give effect to the law according to its plain and obvious meaning." *Mikelson v. United Servs. Auto. Ass'n,* 108 Hawai'i 358, 360, 120 P.3d 257, 259 (2005) (internal quotation marks and citation omitted). The canons of statutory construction also require this court "to construe statutes so as to avoid absurd results." *Tauese v. State, Dep't of Labor & Indus. Relations,* 113 Hawai'i 1, 31, 147 P.3d 785, 815 (2006) (quoting *Frank v. Hawaii Planing Mill Found.,* 88 Hawai'i 140, 144, 963 P.2d 349, 353 (1998)). Furthermore, an interpretation of a statute must be "reject[ed]" if it "renders any part of the statutory language a nullity." *City & County of Honolulu v. Hsiung,* 109 Hawai'i 159, 173, 124 P.3d 434, 448 (2005) (internal quotation marks and citation omitted).

Appellant seeks "statutory damages pursuant to [HRS] § 101–27 because although [Appellee] improperly forced [Appellant] to litigate [Condemnation 1], [Appellee] did not succeed in taking the property in that case." It contends that "the [court] invalidated [Condemnation 1], holding it was void and the taking was not for public use, but for Oceanside's private benefit[,]" and therefore, Appellee failed to "tak[e] the property in that case" notwithstanding the fact that Condemnation 2 was upheld.

In support of its position, Appellant makes four sub-arguments: (1) the consolidation of the two condemnation actions pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 42 (2008) "did not relieve [Appellee] of its [HRS] § 101–27 obligation"; (2) the legislature did not intend to allow "serial eminent domain abuse" as a means of allowing the government to escape payment of statutory damages; (3) the term "proceedings" for purposes of HRS § 101–27 "means a single eminent domain action, not many"; and (4) "[HRS § ]101–27 is unambiguous," requiring that the "[g]overnment bear[ ] the risk of eminent domain failures[.]"

Appellee argues that Appellant's fees motion "was properly denied[.]" In support of its position, Appellee makes three subarguments:

(1) HRS § 101–27 does not apply because the property was finally taken for public use in the consolidated action where [Appellant was] awarded just compensation for the property; (2) the Motion for Summary Damages was filed outside of the 10–day period permitted under HRS § 101–27; and (3) [Appellant] did not present a sufficient record to determine reasonable attorneys' fees.

With respect to Appellant's first subargument, Appellant urges that the court's "consolidation of the two condemnation actions did not relieve [Appellee] of its [HRS] § 101–27 obligation to make [Appellant] whole after the court denied [Appellee] relief in [Condemnation 1]." In sum, Appellant argues that "even though [the court] held that [Appellee] could take [Appellant's] property in [Condemnation 2, it] does not mean that it was 'finally taken for public use' for purposes of [HRS] § 101–27." (Quoting HRS § 101–27.) In response, Appellee maintains in its first subargument that Appellant "ha[s] not carried [its] burden of proving that HRS § 101–27 applies to an eminent domain defendant who ultimately lost in a consolidated condemnation trial[.]"

Appellant and Appellee are correct that the issue of whether Appellant is entitled to statutory damages under HRS § 101–27 turns upon whether the property in question "was finally taken" under that statute. HRS § 101–27 identifies three circumstances under which a defendant in an eminent domain action is entitled to statutory damages: (1) where the eminent domain proceedings are "abandoned . . . before reaching a final judgment"; (2) where the eminent domain proceedings are "discontinued . . . before reaching a final judgment"; or (3) if "for any cause, the property concerned is not finally taken for public use[.]" Because neither party has alleged that Condemnation 1 was "abandoned" or "discontinued," Appellant can only recover statutory damages under the third circumstance, if "the property concerned [was] not finally taken for public use[.]"

█ It is evident that Appellant is correct that "the property concerned [was] not finally taken for public use" in Condemnation 1. As noted previously, in that action, the court stated in its order that *"[t]he Condemnation is invalid.* Judgment is hereby ordered to be entered in favor of [Appellant] and against [Appellee]. . . ." (Emphasis added.) That the property was eventually condemned after Appellee prevailed in the second condemnation action it filed is of no import. To hold, as Appellee argues, that statutory damages under HRS § 101–27 are unrecoverable by the prevailing defendant in a condemnation action if the property in question is later condemned in another, subsequently filed condemnation action, would render a portion of the statute a nullity. Under this interpretation, statutory damages could never be recovered under HRS § 101–27 by a prevailing defendant because there is always a risk that the property might be "finally taken for public use" in a future condemnation action. Thus, under this interpretation, a defendant could only recover statutory damages under HRS § 101–27 where the condemnation proceedings are abandoned or discontinued, and not where defendant prevailed in an action, contrary to the plain meaning of the statute.[10]

Insofar as a statute must be interpreted to avoid rendering any part of it a nullity, *see Hsiung*, 109 Hawai'i at 173, 124 P.3d at 448, HRS § 101–27 cannot be interpreted as precluding the recovery of statutory damages if

---

**10.** Appellee cites *State v. Davis*, 53 Haw. 582, 585–86, 499 P.2d 663, 666–67 (1972), for the proposition that HRS § 101–27 manifests a legislative intent to preclude recovery if the property is finally taken, and that "an eminent domain proceeding is not to be deemed 'in favor of the defendant and against the plaintiff' unless the property sought to be condemned is not finally taken for public use." However, *Davis* is inapposite, as it did not address application of the statute under circumstances where the landowner was actually successful with respect to one of the condemnation actions at issue. In *Davis*, the government was successful on all counts, but the defendants argued that attorneys' fees and costs should be included as part of the "just compensation" awarded. *Id.* at 583–86, 499 P.2d at 665–67. The court referred to HRS § 101–27 as indicating that the legislature only intended for defendants to receive attorneys' fees and costs where the landowner is successful on the merits, and not as a part of just compensation where the land is taken. *Id.* at 585, 499 P.2d at 666.

the defendant prevails in a condemnation action but fails in a subsequent condemnation action on the same property. *See also E & J Lounge Operating Co. v. Liquor Comm'n of City & County of Honolulu,* 118 Hawai'i 320, 349, 189 P.3d 432, 461 (2008) (stating "the well-established tenet of statutory construction [is] that an interpreting court should not fashion a construction of statutory text that effectively renders the statute a nullity or creates an absurd or unjust result" (internal quotation marks, citation, and emphasis omitted)). Accordingly, Appellant is correct that, for purposes of HRS § 101–27, the property in question was not finally taken in Condemnation 1, irrespective of the fact that the property in question was taken in a subsequent condemnation action.

As to its second subargument, Appellant argues that, with respect to HRS § 101–27, "the [l]egislature did not intend to be an enabler of dysfunctional and abusive government conduct" and therefore "[it] surely could not have intended ... to *encourage* local governments to become serial takers and keep pressing forward in repeated condemnation lawsuits without consequence, until they finally win one, or the property owner is bankrupted." (Emphasis in original.) Appellee does not respond to Appellant's second subargument.

Appellant is correct that Appellee's interpretation of HRS § 101–27 as precluding the recovery of damages by a defendant who prevails in one condemnation action but fails in a later condemnation action, would "enable serial eminent domain abuse" by the government. Under Appellee's interpretation, HRS § 101–27 would allow recovery of statutory damages by a defendant in an eminent domain action where the action was "abandoned or discontinued," but the defendant could not recover damages if the defendant prevailed at trial because it would be possible that the government could bring one or more eminent domain actions in the future under which the property might be "finally taken for public use[.]" HRS § 101–27.

This interpretation does not comport with common sense and fairness, as it would be patently unjust under the statute to award damages to a defendant where the eminent domain action was discontinued or abandoned, but deny them where the defendant prevailed and received a final judgment in his or her favor. Such an interpretation is legally absurd in that the statute would penalize the government for abandoning or discontinuing eminent domain actions but would not sanction it for bringing actions lacking merit that result in judgments in favor of the defendant. Thus, as Appellant notes, "[i]nterpreting the term 'finally taken' to mean anything beyond a single, discrete eminent domain lawsuit would transform that statute from one designed to *remedy* eminent domain abuse into one that *encourages* it, a plainly unintended and absurd result." (Emphases in original.)

This court is "bound to construe statutes so as to avoid absurd results." *Tauese,* 113 Hawai'i at 31, 147 P.3d at 815 (internal quotation marks and citation omitted); *see also Beneficial Hawai'i, Inc. v. Kida,* 96 Hawai'i 289, 308, 30 P.3d 895, 914 (2001) (stating that "the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality" (internal quotation marks and citation omitted)). Thus, Appellee's interpretation of HRS § 101–27 must be rejected to the extent that it not only renders a portion of the statute a nullity as described *supra,* but also produces a legally absurd outcome.

With respect to Appellant's third subargument, Appellant contends that the term "proceedings" as used in HRS § 101–27 refers to "a single eminent domain lawsuit, not several." In support of this subargument, Appellant states that other statutes in HRS chapter 101 governing the state's eminent domain powers "use the term 'proceedings[ ]' ... [to] mean a single condemnation action." [11] Appellant cites HRS § 101–13 (1993), the stat-

---

11. Appellant also cites to language from *Davis* that seems to indicate that HRS § 101–27 refers to a final judgment in a single eminent domain proceeding, not several. *See* 53 Haw. at 586, 499 P.2d at 667 ("It is clear from HRS § 101–27, however, that judgment in *an eminent domain proceeding* is not to be deemed 'in favor of the defendant and against the plaintiff' unless the property sought to be condemned is not finally taken for public use." (Emphasis added.)).

ute pertaining to the exercise of eminent domain powers by a county, which provides, in pertinent part as follows:

> Exercise of power by county. Whenever any county deems it advisable or necessary to exercise the right of eminent domain in the furtherance of any governmental power, *the proceedings* may be instituted as provided in section 101–14 after the governing authority (county council, or other governing board in the case of an independent board having control of its own funds) of the county has authorized *such suit* by resolution duly passed, or adopted and approved, as the case may be.

(Boldfaced font in original.) (Emphases added.)

Appellant argues that HRS § 101–13 "treats 'the proceedings' as a single suit by later use of the term 'such suit,' meaning 'one.'" Thus, Appellant asserts that because under HRS § 1–16 (1993), "'[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other[,]'" HRS § 101–27 "must be read" as referring to a single suit. Appellee answers that Appellant "ha[s] not carried [its] burden of proving that HRS § 101–27 applies to an eminent domain defendant who ultimately lost in a consolidated condemnation trial[.]"

Neither the term "proceedings" as used in HRS § 101–27, nor the singular form "proceeding," is defined in that statutory section or in HRS chapter 101 governing eminent domain. The term "proceeding" is defined in Black's Law Dictionary as

> 1. The regular and orderly *progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment.* 2. Any procedural means for seeking redress from a tribunal or agency. 3. *An act or step that is part of a larger action.* 4. The business conducted by a court or other official body; a hearing.

*Black's Law Dictionary* 1241 (8th ed.2004) (emphases added).

This definition is not helpful in resolving the issue of whether the term "proceedings," as used in HRS § 101–27, refers to a single suit or multiple suits. On the one hand, the third definition supports Appellant's argument that the term "proceedings" refers to a single suit. If the term "proceeding" is equivalent to "[a]n act or step that is part of a larger action[,]" then a single suit could contain many proceedings. On the other hand, the first definition supports Appellee's argument that the term "proceedings" could refer to multiple suits. If the term "proceeding" means "a lawsuit, including all acts and events between the time of commencement and the entry of judgment[,]" then in the plural, "proceedings" would connote multiple lawsuits.

Turning to case law, the term "proceeding" has been used to refer to a single lawsuit in accordance with the first definition in Black's Law Dictionary which implies that the plural term, "proceedings," refers to multiple lawsuits. *See, e.g., Hawaii Ventures, LLC v. Otaka, Inc.,* 116 Hawai'i 465, 470, 173 P.3d 1122, 1127 (2007) (using the term "proceedings" interchangably with the term "actions"). However, the term "proceedings" has also been used to refer to steps that are part of a larger action in accordance with the third definition. *See Singleton v. Liquor Comm'n, County of Hawai'i,* 111 Hawai'i 234, 250 n. 44, 140 P.3d 1014, 1030 n. 44 (2006) (using the term "proceedings" to refer to hearings held by a county liquor commission in the plaintiff's action to obtain a permit for the sale of liquor).

Although the ordinary meanings of "proceedings" in Black's Law Dictionary and in case law provide support for both parties, the term "proceedings" for purposes of interpreting HRS § 101–27 can only be reasonably read as referring to a single action. If the term "proceedings," as used in HRS § 101–27, referred to multiple suits as argued by Appellee, then it could never be determined at the conclusion of a particular condemnation action whether the defendant's property would be "finally taken for public use" because, again, subsequent condemnation actions could always be filed against the property owner in which the property might eventually be taken. As discussed *supra,* this interpretation of HRS § 101–27 is impermissible because it renders a portion of the statute a nullity and would create an

absurd result not attributable to the legislature. Thus, the term "proceedings" as used in HRS § 101–27 must be construed as referring to a single condemnation action.

With respect to Appellant's fourth subargument, Appellant declares that HRS § 101–27 "unambiguous[ly]" requires that the "government bear[ ] the risk of eminent domain failures." Appellant contends that "[t]he conclusion that [it is] entitled to damages is simple enough if one adheres to the plain text of [HRS] § 101–27[.]" Appellee does not respond to this subargument.

■ To reiterate, HRS § 101–27 must be read as allowing a defendant who prevails in a condemnation action to recover damages sustained in that action regardless of whether the defendant's property is later taken for public use in a subsequent condemnation action. As discussed *supra*, HRS § 101–27 must be interpreted in this manner in order to prevent part of the statute from being rendered a nullity and to avoid an absurd outcome. Furthermore, as argued by Appellant, eminent domain statutes are to be construed liberally in favor of the landowner. *See Marks v. Ackerman*, 39 Haw. 53, 58–59, 1951 WL 7071 (Terr.1951) (stating that eminent domain "provisions should be construed liberally in favor of the landowner as to remedy in[ ]so[ ]far as they are in harmony with the common-law principles and constitutional guarantees protecting private property[ ]" and that "they should be construed strictly against the condemnor as to right to enter the land of the landowner without his consent in so far as they are in derogation of such principles and guarantees"). Thus, Appellant is correct that the statute allows it to seek damages insofar as the property in question was not taken in Condemnation 1.

■ Appellee's first subargument, that HRS § 101–27 does not apply because Appellant's property was "finally taken" in Condemnation 2, has been answered. With respect to Appellee's second subargument, Appellee urges that Appellant is not entitled to statutory damages pursuant to HRS § 101–27 because under that section it was required to "take steps to have [its claim for damages] tried 'within ten days from the date of the entry of an order of judgment'"

and Appellant failed to do so. (Quoting HRS § 101–27.) Appellee cites the following portion of HRS § 101–27 to support its argument:

> Issues of fact arising in connection with any claim for such damage *shall be tried by the court without a jury unless a trial by jury is demanded by either party, pursuant to the rules of court, within ten days from the date of the entry of an order or judgment* allowing the discontinuance of the proceedings, or dismissing the proceedings or denying the right of the plaintiff to take the property concerned for public use.

(Emphasis added.) Appellant responds that the ten-day limitation in HRS § 101–27 pertains to the request for a jury trial but is not "applicable to the motion for damages itself."

On September 27, 2007, the court entered judgment in favor of Appellant, ordering the condemnation invalid. Fourteen days later, on October 11, 2007, Appellant filed its fees motion. If Appellee is correct that Appellant was required "to take steps to have [its statutory damages] claim tried" within ten days of the entry of judgment "denying the right of [Appellee] to take the property concerned for public use," *see* HRS § 101–27, then Appellant's motion for damages was untimely.

But, contrary to Appellee's contention, under a plain reading of HRS § 101–27, the ten-day limitation is applicable only to the demand for a jury trial on factual issues relating to the condemnation claim. Grammatically, the phrase "pursuant to the rules of court, within ten days" in that section is preceded by the words "unless trial by jury is demanded." Thus, the ten-day phrase would modify the jury demand option.

Moreover, it would be illogical to conclude that the phrase "pursuant to the rules of court, within ten days" applied to the damages trial itself. It would be reasonable and necessary to expressly state that the jury demand must be made in accordance with the HRCP because that section contains a specific and detailed procedure for demand-

ing a jury trial.[12] Without express reference to "the rules of court," a party could conceivably be uncertain as to whether the demand for a jury authorized by HRS § 101–27 must be made in accordance with the rule governing such demand established in HRCP Rule 38 or not. Therefore, the phrase "pursuant to the rules of court" and the phrase "within ten days" immediately following it, appropriately apply to the demand for a jury trial on the damages issues, not to the trial on damages itself. Appellant's fees and costs motion, then, is not precluded by the fact that it was filed more than ten days after the entry of judgment in Condemnation 1.

With respect to its third subargument, Appellee maintains that Appellant "failed to submit a sufficient record for [the court] to award reasonable attorneys' fees." Appellee argues that if Appellant is deemed to have "prevailed on [its] improper delegation of condemnation power defense in [Condemnation 1,]" then "any award under HRS § 101–27 should be limited to amounts paid for the improper delegation of condemnation power defense in [that] case." However, Appellee argues that because Appellant's "motion and supporting documents did not provide a means to determine whether the requested amounts were expended ... on issues other [than] the improper delegation claim[,]" Appellant's motion for statutory damages should be denied due to insufficiency of the record. Appellant did not respond to this subargument.

The court did not rule on Appellant's fees motion. The court is required to dispose of such motions within ninety days. HRAP Rule 4(a)(3) mandates that "failure to dispose of any motion by order entered upon the record within [ninety] days after the date the motion was filed shall constitute a denial of the motion." As noted before, because the court failed to issue an order on Appellant's motion by January 9, 2008, ninety days after Appellant filed the motion, the motion was deemed denied.

 Inasmuch as the court did not enter an order with respect to Appellant's motion for statutory damages, it is indeterminable whether a denial would be based on an erroneous conclusion of law (conclusion) that HRS § 101–27 was inapplicable because the property in question was taken in Condemnation 2, or based on a finding of fact (finding) that Appellant's requested damages were not supported by the evidence. Accordingly, the record on appeal is insufficient to determine on what basis denial would have been based. Moreover, because no determination was made on whether damages were awardable, no record exists as to the court's assessment of Appellant's motion for statutory damages. In contrast with Appellee's contention, Appellant's motion appears to be limited to attorneys' fees and costs incurred in defending Condemnation 1.[13]

 Based on the discussion *supra*, Appellant is entitled to seek statutory damages under HRS § 101–27. As for the scope of damages, HRS § 101–27 provides in pertinent part as follows:

> [A] defendant who would have been entitled to compensation or damages had the property been finally taken, shall be entitled, in such proceedings, to recover from the plaintiff all such damage as may have been sustained by the defendant by reason of the bringing of the proceedings and the

---

12. Rules of court specifically governing the demand for a jury trial are set forth in HRCP Rule 38(b) (2008). That rule provides:

 (b) Demand. *Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service* of the last pleading directed to such issue*, and (2) filing the demand as required by Rule 5(d).* Such demand may be indorsed upon a pleading of the party. Where by statute a jury trial is allowed on appeal to the circuit court from the prior determination of any court or administrative body, a trial by

jury may be had if demanded in the notice of appeal, and if not demanded in the notice, the appellee may have a trial by jury by filing a demand within 10 days after the case is docketed in the circuit court.

(Emphases added.)

13. According to Appellee, Appellant's motion for fees and supporting documents "did not provide a means to determine whether the requested amounts were expended in Civil No. 05–1–15K or were expended in Civil No. 00–1–181K." However, Appellant stated in its motion that it was only requesting attorneys' fees and costs associated with Condemnation 1.

possession by the plaintiff of the property concerned if the possession has been awarded *including the defendant's costs of court, a reasonable amount to cover attorney's fees paid by the defendant in connection therewith, and other reasonable expenses*[.]

(Emphasis added.) According to the statute, Appellant is entitled to costs and attorneys' fees, as well as any expenses that may have been incurred by reason of Appellee taking possession of the property.[14] It is manifest from the language of HRS § 101–27, as well as this court's interpretation of the statute in *Davis*, as discussed *supra*, that any damages awarded must be strictly related to Appellant's expenses in defending Condemnation 1. *See Davis*, 53 Haw. at 586, 499 P.2d at 667.

The court did not enter any order with respect to Appellant's motion for statutory damages. Appellant's motion indicated that the bulk of the amount requested was for attorneys' fees incurred in defending Condemnation 1. It is for the court to determine whether the fees claimed by Appellant are related to Condemnation 1 and are reasonable under relevant standards. Therefore, the case must be remanded to the court for a calculation of the damages to which Appellant is entitled in defending against Condemnation 1.

## IV.

Appellant maintains that under the doctrine of abatement, the court lacked subject matter jurisdiction over Condemnation 2 because Condemnation 1 had not been resolved at the time Condemnation 2 was adjudicated by the court. As a threshold matter, it must be determined whether the court had subject matter jurisdiction over the condemnation proceedings.[15] "Subject matter jurisdiction" is defined as "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the state of things." *Black's Law Dictionary* at 870.

In Hawai'i, pursuant to statute,

(a) The several circuit courts shall have jurisdiction, except as otherwise expressly provided by statute, of:

. . . .

(3) Civil actions and proceedings, in addition to those listed in sections 603–21.6, 603–21.7, and 603–21.8. [16]

HRS § 603–21.5 (Supp.2007). Relying on HRS § 603–21.5, this court has declared that *"the circuit court has jurisdiction over all civil causes of action* unless precluded by the [s]tate [c]onstitution or by statute." *Sherman v. Sawyer*, 63 Haw. 55, 58, 621 P.2d 346, 349 (1980) (emphasis added). HRS chapter 101, entitled "Eminent Domain," explicitly vests jurisdiction over condemnation proceedings in the circuit courts. Specifically, HRS § 101–10 (Supp.2007) mandates that "[t]he circuit courts shall try and determine

---

**14.** It appears from the record that Appellee was put in possession pursuant to Condemnation 1 on October 10, 2000, and that possession was then returned to Appellant on December 11, 2002, also pursuant to Condemnation 1. However, it does not appear from Appellant's motion for damages that it is seeking any expenses related to dispossession.

**15.** The analysis on this point resolves Appellant's Issue 2 generally, and more specifically, its arguments that (1) "two eminent domain actions seeking the same relief cannot be pending in the same court at the same time," (2) "abatement trumps a second condemnation to counter deficiencies raised by [the] landowner in the first condemnation," (3) "consolidation cannot create subject matter jurisdiction," and (4) Appellee's argument that the issue of abatement does not necessarily implicate subject matter jurisdiction is contrary to this court's holding in *Shelton Engineering Contractors, Ltd. v. Hawaiian Pacific*

*Industries, Inc.*, 51 Haw. 242, 456 P.2d 222 (1969), and the ICA's decision in *Matsushita v. Container Home Supply*, 6 Haw.App. 439, 726 P.2d 273 (1986), and Appellee's arguments that (1) the court correctly concluded that abatement did not deprive it of jurisdiction over Condemnation 2 because "the two lawsuits had different causes and prayed for different relief[,]" and (2) abatement does not, as a matter of law, implicate subject matter jurisdiction.

**16.** HRS § 603–21.6 (Supp.2007) pertains to probate cases. HRS § 603–21.7 (1993) lists actions (1) to declare heirs of a decedent; (2) to administer dower or curtesy rights and partitioning real property; (3) relating to trusts, mortgages, contracts, and suits in equity; and (4) for writs or orders "to courts of inferior jurisdiction, corporations and individuals[.]" HRS § 603–21.8 (1993) pertains to appeals brought from the decision of another court or an agency.

all actions arising under this part, subject only to an appeal in accordance with law." Thus, it is evident that the court "can rule on the conduct of persons or the state of things" in proceedings in the nature of condemnation and can award the relief sought in that action. *See Black's Law Dictionary* at 870.

It is concluded that, as a general rule, the court has subject matter jurisdiction over eminent domain proceedings. The question then is whether the pendency of Condemnation 1 deprived the court of its jurisdiction in relation to Condemnation 2. Neither *Shelton Engineering* nor *Matsushita*, the cases relied upon by Appellant, explicitly holds that abatement raises issues of subject matter jurisdiction. Similarly, Appellee does not cite to any case law from this jurisdiction holding the converse, *i.e.,* expressly stating that abatement is *not* a question of subject matter jurisdiction. Thus, a survey of opinions from other jurisdictions is useful at this juncture.

### A.

Upon review, it appears that Appellant's contention that abatement necessarily implicates a court's subject matter jurisdiction over a case is not correct. Rather, it appears that abatement is a remedy for a variety of defects, *including* lack of subject matter jurisdiction. *See Bd. of Regents v. Oglesby,* 264 Ga.App. 602, 591 S.E.2d 417, 421 (2003) (explaining that "a defendant can raise a plea in abatement ... that raises *the issue* of the lack of subject matter jurisdiction in the trial court" (citing Ga.Code Ann. § 9–11–12(b)(1) (1993)) (emphasis added)); *Cummins Mgmt., L.P. v. Gilroy,* 266 Neb. 635, 667 N.W.2d 538, 544 (2003) (holding that, when *"the basis* for the plea in abatement is the court's lack of subject matter jurisdiction, the court is obligated to dismiss without prejudice, rather than to suspend the action" (emphasis added)). "Abatement" is defined, pertinently, as "[t]he suspension or defeat of a pending action for a reason unrelated to the merits of the claim," *Black's Law Dictionary* at 3, lending further support to this construction.

Contrary to Appellant's position, some jurisdictions have rejected the contention that abatement necessarily implicates subject matter jurisdiction, mainly on the ground that abatement, unlike subject matter jurisdiction, can be waived. In *Kelly v. Kelly,* 245 S.W.3d 308, 314 (Mo.App.2008), the Missouri Court of Appeals held that abatement and lack of subject matter jurisdiction are not synonymous. That court reiterated the Missouri Supreme Court's criticism "that the term jurisdiction has been overused and misused to describe situations *where it was simply legally erroneous to enter a conflicting judgment while another action was pending*[.]" *Id.* at 315 (emphasis added). In that connection, the Missouri Court of Appeals rejected the argument that abatement implicated subject matter jurisdiction, because, under Missouri Rules of Civil Procedure Rule 55, the abatement defense could be waived, whereas, contrastingly, "[o]ne would never view subject matter jurisdiction as being waivable." *Id.* at 314; *see also Bourque v. Comm'r of Welfare,* 6 Conn.Cir.Ct. 685, 308 A.2d 543, 548–49 (1972) (holding that where a defendant failed to raise the pendency of prior proceedings as a defense to subsequent proceedings, either in its answer or in a motion for abatement, *"the issue was waived"* (citation omitted) (emphasis added)); *Cent. Trust Co. of Ill. v. Owsley,* No. 19,527, 188 Ill.App. 505, 1914 WL 2753 at *8 (Oct.6, 1914) (explaining that "the objection of a prior proceeding pending could only have been made by a plea in abatement in the Circuit Court[ ]" and that "[n]ot only was this plea not made, but *the point was waived"* (emphasis added)); *Nicholson v. State,* 18 Wyo. 298, 106 P. 929, 930 (1910) (holding that the defense of abatement grounded on prior proceedings *"is waived* unless interposed by motion to quash or plea in abatement" (emphasis added)).

Based on the foregoing, the pendency of Condemnation 1 did not deprive the court of subject matter jurisdiction over Condemnation 2.

### B.

Appellee claims that it is a "fundamental principle that [it] cannot be denied rights to acquire property, that is, the power of eminent domain, it determines to be necessary to

[its] function by reason of contract, res judicata, estopple [sic] or claim of abatement in prior legal actions." According to Appellee, "the power of eminent domain is essential for the proper performance of governmental functions such that it cannot be surrendered, and, if attempted to be transferred away, or otherwise impeded, such as by a plea in abatement, it may be resumed at will." (Citing *Georgia v. City of Chattanooga*, 264 U.S. 472, 480, 44 S.Ct. 369, 68 L.Ed. 796 (1924); *Tenn. Gas Transmission Co. v. Violet Trapping Co.*, 200 So.2d 428 (La.App.1967); *Burke v. Oklahoma City*, 350 P.2d 264, 268 (Okla.1960); *State v. Charlton*, 71 Wash.2d 748, 430 P.2d 977, 978–79 (1967).)

On the contrary, the cases cited by Appellee do not support the contention that a plea in abatement cannot successfully "impede" a particular attempt by a governmental entity to exercise its power of eminent domain. The cases cited uniformly support the proposition that the power of eminent domain may not be inhibited by contract, but none of the cases hold that abatement is not a viable defense in a condemnation action. To illustrate, in *Georgia v. City of Chattanooga*, Tennessee had previously entered into a contract with Georgia allowing Georgia to use the land at issue for railway purposes. 264 U.S. at 478, 44 S.Ct. 369. Chattanooga attempted to condemn the land governed by the contract and Georgia objected. *Id.* Georgia argued that its agreement with Tennessee rendered it immune from Tennessee's, and therefore, Chattanooga's, power of eminent domain. *Id.* at 479, 44 S.Ct. 369. The

United States Supreme Court held that Tennessee could not surrender its power of eminent domain through contract. *Id.* at 480, 44 S.Ct. 369. Thus, Chattanooga could pursue the condemnation. *Id.* at 481, 44 S.Ct. 369. Appellee's contention, then, that the defense of abatement may not be invoked in an eminent domain proceeding, is not supported by the cases cited.[17]

### C.

■■■ Appellant asserts that consolidation of Condemnation 1 and 2 under HRCP Rule 42 is not the equivalent of merger, thus Appellee was required "to establish subject matter jurisdiction in both lawsuits." It further maintains that this court's decision in *Shelton Engineering* and the ICA's decision in *Matsushita* establish that abatement implicates subject matter jurisdiction.

Appellee responds that abatement does not, *as a matter of law*, implicate subject matter jurisdiction, noting that other courts have "held that abatement does not implicate the subject matter jurisdiction of the court and the trial court has broad discretion in applying abatement." (Citing *Halpern v. Bd. of Educ.*, 196 Conn. 647, 495 A.2d 264, 266 n. 4 (1985); *Kelly*, 245 S.W.3d at 314.) Appellee urges that, if this court follows that holding, "[the court] clearly did not abuse its discretion because the causes and relief are sufficiently different and consolidation achieved the goals of abatement." Alternatively, Appellee argues that, even if abatement would generally destroy subject matter

---

17. In *Tennessee Gas,* a prior condemnation suit had been settled and the settlement memorialized in a contract. 200 So.2d at 432. In the subsequent suit, the defendants raised the contract as a defense, arguing that the settlement contract indicated that the plaintiff would not take any more of defendant's land. *Id.* at 433. The Louisiana Court of Appeals held that the plaintiff could not contract away its power to take private property for a public purpose. *Id.* Similarly, in *Burke,* the defendants pled defenses of contract, waiver, and estoppel, based on the settlement reached between the parties in an earlier suit seeking condemnation of the same property involved in the later suit. 350 P.2d at 266. The Supreme Court of Oklahoma held that the defenses of *res judicata* and estoppel were not available against the government in condemnation proceedings. *Id.* at 267 (explaining that

holding those defenses were available "would be holding that a municipality can surrender, alienate and contract away or waive the right of eminent domain which it cannot do").

Finally, in *Charlton,* the parties had also negotiated a settlement in prior condemnation proceedings. 430 P.2d at 978. In the subsequent proceeding, the defendants raised the defense of estoppel. *Id.* The Supreme Court of Washington did not decide whether estoppel was always unavailable to defendants in eminent domain proceedings, avoiding the question by holding that there was not evidence in that case to support the defense. *Id.* at 980. Further, that court noted that the doctrine of estoppel "is not a favored one when applied to municipal corporations or the state when acting in a governmental capacity." *Id.* at 979.

jurisdiction, in this case "abatement would not apply because the cases were consolidated." (Citing *Kehr v. Kehr*, 173 Neb. 532, 114 N.W.2d 26, 28 (1962) (for the proposition that "the purpose of abatement[,] 'to avoid multiplicity of suits,' does not apply where the matters are consolidated")).

HRCP Rule 42 is identical to its counterpart in the Federal Rules of Civil Procedure (FRCP). In construing FRCP Rule 42, Professors Wright and Miller explain that

> [i]n the context of legal procedure, "consolidation" is used in three different senses:
>
> (1) When all except one of several actions are stayed until one is tried, in which case the judgment in the one trial is conclusive as to the others. This is not actually a consolidation but sometimes is referred to as such.
>
> (2) *When several actions are combined into one, lose their separate identity [sic], and become a single action in which a single judgment is rendered.* An illustration of this is the situation in which several actions are pending between the same parties stating claims that might have been set out originally as separate counts in one complaint.
>
> (3) *When several actions are ordered to be tried together but each retains its separate character and requires the entry of a separate judgment. This type of consolidation does not merge the suits into a single action,* or cause the parties to one action to be parties to another.

9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2382, at 8–9 (3d ed.2008) (footnotes omitted) (emphases added). Appellee espouses the second view, maintaining that the consolidation of Condemnation 1 and Condemnation 2 made the two suits one. On the other hand, Appellant advocates the third interpretation, that consolidation did not, on its own, merge the suits.

As to this issue, it appears that Appellant is correct. In choosing among the three options described above, Professors Wright and Miller conclude that

> the rule seems to authorize both the second and third of the procedures.... The

case law, however, is quite clearly to the contrary. *The federal courts have read the rule as providing only for the third of these procedures.* They regard as still authoritative what the Supreme Court said about consolidation a few years before [FRCP] Rule 42(a) was adopted:

> consolidation is permitted as a matter of convenience and economy in administration, but *does not merge the suits into a single cause,* or change the rights of the parties, or make those who are parties in suit parties to another.

*Id.* at 10 (quoting *Johnson v. Manhattan Ry. Co.,* 289 U.S. 479, 496–97, 53 S.Ct. 721, 77 L.Ed. 1331 (1933)) (emphases added) (footnote omitted). Relying on the foregoing language, our courts have apparently followed the interpretation adopted by the federal courts. *See First Hawaiian Bank v. Timothy,* 96 Hawai'i 348, 352 n. 2, 31 P.3d 205, 209 n. 2 (App.2001) (concluding that the trial court, in consolidating the subject cases, "intended that the actions be tried jointly but retain their separate character"). Moreover, given that Condemnation 1 and Condemnation 2 retained their separate identities and the court entered separate judgments in each action, it is evident that the third procedure described above is more apt to the circumstances of this case. Thus, the consolidation did not merge Condemnation 1 and Condemnation 2, and we must address the question of whether Condemnation 2 was abated by Condemnation 1.

### D.

This court has held that "where the party is the same in a pending suit, and the cause is the same and the relief is the same, a good plea in abatement lies." *Shelton Eng'g,* 51 Haw. at 249, 456 P.2d at 226 (citations omitted).

 Appellant contends that
> [w]here a claim involves the same subject matter and parties as a previously filed action, so that the same facts and issues are presented, resolution should occur through the prior action, and a second suit should be dismissed. It is fundamental that a plaintiff is not authorized simply to ignore a prior action and bring a second,

independent action on the same state of facts while the original action is pending.

(Quoting 1 Am.Jur.2d *Abatement* § 6, at 89 (2005).) Accordingly, it argues that "two eminent domain actions seeking the same relief cannot be pending in the same court at the same time[.]"[18] Appellant argues that Condemnation 2 was abated by the pendency of Condemnation 1 because "the court was the same, the parties were the same, and the relief was the same (property for the same [Bypass]; the only differences in the legal description of [Appellant's] property in Condemnation [1] and Condemnation [2] were minor, at best)." It contends that the court erred in concluding that the "attenuation" between the two causes of action was sufficient to create different causes.[19]

In response, Appellee argues that "[the court] correctly decided that [Appellant] failed to prove the claim for abatement because the two lawsuits had different causes and prayed for different relief." In this connection, the court found that "[Condemnation 1] was an eminent domain action based on County Resolution [No.] 266–00." In contrast, the court found that "[Condemnation 2 was] an eminent domain action based on Resolution [No.] 31–03." The court further found that Resolution No. 31–03 authorized Appellee "to condemn a larger parcel of [Appellant's property] for the Bypass." Based on these findings, the court concluded:

10. ... As the basis [sic] for these two County Resolutions are substantially different from each other, and have been voted on by two different County Councils over four years apart, the [c]ourt concludes that [Condemnation 1] and [Condemnation 2] are separate claims for the purposes of abatement.

11. [Condemnation 1] prays for the condemnation of 2.90 acres of [Appellant's] land. [Condemnation 2] prays for the condemnation of 3.348 acres of [Appellant's] land. As there is nearly a half acre difference (0.448 acres) in the prayer for relief in the two eminent domain cases, the [c]ourt concludes that [Condemnation 1] and [Condemnation 2] request different relief for the purposes of abatement.

(Quotation marks and footnote omitted.)

It suffices here to note that the area of the land that Appellee sought to condemn was different by nearly a half acre in Condemnation 1 and Condemnation 2, a difference of approximately 20%. Arguably, then, the relief sought in the two actions encompassed two different prayers for relief. In that light it cannot be said that the court wrongly concluded that Condemnation 2 was not abated by Condemnation 1.[20]

---

**18.** In support of this position, Appellant cites to *Red Oak Farm, Inc. v. City of Ocala*, 636 So.2d 97, 98 (Fla.App.1994), in which the Florida Court of Appeals held that a second suit to condemn the same property, filed while the first suit was pending on appeal, should have been dismissed. They also rely on *Maxey v. Redevelopment Authority of Racine*, 94 Wis.2d 375, 288 N.W.2d 794, 803 (1980), in which it was held that a condemnation suit could not proceed where the landowner had earlier filed an inverse condemnation action relating to the same property.

**19.** Appellant argues that Appellee could have effectively changed the land area at issue by amending Condemnation 1 under HRS § 101–19 (1993). That statute provides as follows:

In all proceedings under this part the court shall have power at any stage of the proceeding to allow amendment in form or substance in any complaint, citation, summons, process, answer, motion, order, verdict, judgment or other proceeding, including amendment in the description of the lands sought to be condemned, whenever the amendment will not impair the substantial rights of any party. ·

However, the fact that Appellee could have amended its complaint does not alter our analysis. The state of the record is that Appellee did not amend Condemnation 1.

**20.** This conclusion addresses Appellant's arguments from its Opening Brief that "two eminent domain actions seeking the same relief cannot be pending in the same court at the same time[,]" and "when two lawsuits seek the same relief, the 'cause' is the same." It also addresses the related arguments raised in Appellant's Reply Brief that (1) the difference in the two parcels sought "did not make the relief [Appellee] sought in the two cases different since in both cases it sought condemnation of property for a road from Hokulia to Mamalahoa Highway[,]" (2) "for the second action to be considered different from the first, the relief sought must actually be legally and materially distinct[,]" (citing *Shelton Eng'g*, 51 Haw. at 247–48, 456 P.2d at 225–56; *Oahu Lumber & Bldg. Co. v. Ah Yok*, 11 Haw. 416, 418 (1898)), and (3) the omission of references to the

## E.

■ As to Appellant's argument that "subjecting property owners to concurrent condemnations violates due process," Appellee argues that the contention should be deemed waived because Appellant did not raise it to the court.[21] Appellant does not dispute the alleged failure to raise this argument. "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." *State v. Moses,* 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003); *see, e.g., State v. Hoglund,* 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to raise an issue at the trial level precludes a party from raising that issue on appeal.").

■ Additionally, Appellant fails to provide this court with arguments upon which a decision can be rendered. *Cf. Kaho'ohanohano v. Dep't of Human Servs.,* 117 Hawai'i 262, 298 n. 37, 178 P.3d 538, 578 n. 37 (2008) (determining that the appellant had failed to raise a discernible argument with regard to any factual errors contained in the trial court's findings because it did not point to any specific finding as being incorrect, but rather raised a general objection to them, thereby "shift[ing] the burden upon this court to comb through the 249 [findings] and determine which of the [findings] are erroneous"); *Exotics Hawaii–Kona, Inc. v. E.I. Du*

*Pont De Nemours & Co.,* 116 Hawai'i 277, 288, 172 P.3d 1021, 1032 (2007) (noting that this court could disregard one of the appellants' contentions because they failed to make any "discernible argument or cite to any authority with respect to their position"); *Laeroc Waikiki Parkside, LLC · v. K.S.K. (Oahu) Ltd. P'ship,* 115 Hawai'i 201, 212, 166 P.3d 961, 972 (2007) (concluding that the appellant made no discernible argument because it "cite[d] no authority, present[ed] no analysis as to this argument, and d[id] not explain the relevance of" the omission complained of).

In this case, Appellant makes general assertions that defendants are entitled to due process protections in eminent domain proceedings. However, Appellant fails to explain specifically which due process rights were infringed by this process and how.[22] The mere assertion that "[d]ue process is violated when a property owner is forced to endure concurrent attempts to condemn the same land," without elaboration or citation to authority, does not enable this court to reach a reasoned conclusion. Based on the foregoing, Appellant's general due process argument is deemed waived.[23]

## V.

■ Appellant's Issue 3 concerns whether courts are obligated to accept the government's asserted public purpose for a taking

---

Development Agreement in Condemnation 2 "did not make the relief sought by [Appellee] ... materially different" because its "goal in both cases remained the taking of [Appellant's] property for [the Bypass]."

In that connection, this conclusion addresses Appellee's counterarguments in its Answering Brief that (1) the court correctly concluded that abatement did not deprive it of jurisdiction over Condemnation 2 because "the two lawsuits had different causes and prayed for different relief[,]" (citing *Shelton Eng'g,* 51 Haw. at 249, 456 P.2d at 226–27), because (a) the condemnation actions were instituted pursuant to different resolutions of the HCC, (b) Condemnation 1 referred to the Development Agreement, but Condemnation 2 did not, and (c) the parcel sought in Condemnation 2 was "nearly half an acre" larger than the parcel sought in Condemnation 1, and (2) courts insist upon "strict compliance" with the same cause/same relief requirement only where abatement is deemed related to the doctrine of *res*

*judicata,* (citing *Horter v. Commercial·Bank & Trust Co.,* 99 Fla. 678, 126 So. 909, 912 (1930)).

**21.** In its September 27, 2007 Judgment, the court concluded that "[Appellant's d]ue [p]rocess claims ha[d] been addressed in [its] ruling on the Failure to Object within Ten (10) Days." It is not clear where in the record this ruling is located. It has already been noted that this court will not "sift through the voluminous record to verify an appellant's ... contentions." *Lanai Co.,* 105 Hawai'i at 309 n. 31, 97 P.3d at 385 n. 31.

**22.** Appellee provides little counterargument, merely stating that "[Appellant's] due process rights were not violated by concurrent attempts to condemn the same land ... because the cases involved different causes and relief, and the cases were consolidated."

**23.** Insofar as this argument invokes a constitutional argument concerning due process under the Fifth Amendment, it is addressed *infra.*

when faced with the assertion that the public purpose may be a pretext for a primarily private benefit. Appellant's argument challenging the validity of the asserted public purpose underlying the condemnation presents a question of constitutional law, which this court reviews *de novo* under the right/wrong standard. *See State v. Cuntapay*, 104 Hawai'i 109, 113, 85 P.3d 634, 638 (2004) ("We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." (Internal quotation marks, citations, and ellipsis points omitted.)).

### A.

Appellant maintains the court erred in not "look[ing] beyond Resolution [No.] 31–03" to adjudicate Appellant's claim "that the asserted public use was a pretext . . . to hide the predominantly private benefit of the [Bypass] to Oceanside[,]" and therefore requests that the court's Judgment in Condemnation 2 "be reversed, and the case remanded to consider whether [Appellee's] claim that the taking was for public use is valid, or was a pretext to hide the predominant private benefit to Oceanside." [24] According to Appellant, "[the court] cannot merely accept the government's word that a taking is for public use." (Formatting altered.) It contends that "the public use question is judicial in nature and is decided on the facts and circumstances of each case." (Citing *Haw. Hous. Auth. v. Ajimine*, 39 Haw. 543 (Terr.1952).)

Contrastingly, Appellee asserts that the "applicable public purpose test" states that "where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the [United States Supreme]

Court has never held a compensated taking to be proscribed by the [p]ublic [u]se [c]lause." (Quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984).) (Other citations omitted.)

### B.

■■■ Article I, section 20 of the Hawai'i Constitution states that "[p]rivate property shall not be taken or damaged for public use without just compensation." This court has interpreted the "public use" clause to authorize takings for "public purposes." *Haw. Housing Auth. v. Lyman*, 68 Haw. 55, 68, 704 P.2d 888, 896 (1985) (holding that "[w]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, a compensated taking is not proscribed by the public use clause" (citation omitted)). It is well-settled that legislative bodies vested with the power of eminent domain have broad discretion in determining what uses will benefit the public and what land is necessary to facilitate those uses. As a general rule,

> the right to declare what shall be deemed a public use is vested in the legislature; and consequently, when the public nature of a use for which a taking has been authorized by law is disputed, *the question as it presents itself to the courts is whether the legislature might reasonably have considered the use public, not whether the use is public. This rule rests on the presumption that a use is public if the legislature has declared it to be such.*

*Ajimine*, 39 Haw. at 549 (emphasis added) (internal quotation marks and citations omitted).[25] Accordingly, "great weight" is accorded to "legislative findings and declara-

24. Appellant's prayer for relief concerning the dispositions on appeal available to this court should be clarified. Pursuant to HRAP Rule 35(e) (2008), "the word 'reverse' ends litigation on the merits, and the phrase 'vacate and remand' indicates the litigation continues in the court . . . in accordance with the appellate court's instruction." Accordingly, it is presumed that, in connection with issue (3), Appellant seeks to have the court's Judgment in Condemnation 2 vacated and remanded for a determination of whether the asserted public purpose was pretextual.

In response to Appellant's requested relief, Appellee does not ask for anything except affirmance of the Judgment in Condemnation 2.

25. The court in *Ajimine* was concerned with the application of Revised Laws of Hawaii § 3501 (1945), which declared that "the clearance, replanning, and reconstruction of areas in which unsanitary or unsafe housing conditions exist" to provide "safe and sanitary dwelling accommodations for persons of low income" were "public uses and purposes for which public money may be spent and private property acquired[.]"

tions of public use." *Id.* In fact, the legislative determination "is entitled not only to respect but to a prima facie acceptance of its correctness." [26] *Id.* at 550 (internal quotation marks and citation omitted). In order to overcome the prima facie evidence of public use, a defendant must show that "such use is clearly and palpably of a private character." *Id.* (internal quotation marks and citation omitted).

 However, the legislature's discretion in this area is not unfettered. As Appellant notes, neither "the decision of the legislature [n]or the presumption is conclusive, for the issue of public use is a judicial question and one of law to be decided on the facts and circumstances of each particular case." [27] *Id.* Hence, "the great weight accorded to the legislative finding and the prima facie acceptance of its correctness, as well as the binding effect of the presumption, demonstrate[ ] that the courts will not lightly disturb such a finding and will not overrule it unless it is manifestly wrong." *Id.* Contrary to Appellee's position, then, under the Hawai'i constitution, courts may consider the validity of the public purpose asserted in a condemnation action. Consequently, under appropriate circumstances, courts may consider whether a purported public purpose is pretextual.

### C.

As concluded above, our case law supports the proposition that a court can look behind the government's stated public purpose. However, Appellant relies heavily on federal law, primarily the Supreme Court's decision in *Kelo v. City of New London, Conn.,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), to support the contention that the condemning authority's motives should be scrutinized. As discussed *infra,* the *Kelo* majority opinion, consistent with our prior decisions, allows courts to look behind an eminent domain plaintiff's asserted public purpose under certain circumstances.

### 1.

In *Kelo,* Connecticut's Office of Planning and Management reviewed a revitalization proposal for New London, an economically depressed area, and determined that "the project was consistent with relevant state and municipal development policies." 545 U.S. at 474 n. 2, 125 S.Ct. 2655. The New London Development Corporation (NLDC), a non-profit, quasi-governmental entity charged with revitalizing New London, "announced that it would lease some of the parcels to private developers in exchange for their agreement to develop the land according to the terms of the development plan. Specifically, [it] was negotiating a 99–year ground lease with Corcoran Jennison, a developer selected from a group of applicants." *Id.* at 476 n. 4, 125 S.Ct. 2655.

**26.** Pursuant to HRS § 101–1 (1993), the governmental body seeking to condemn private property is the plaintiff in the condemnation action. HRS § 101–11 (1993) instructs that "[e]xcept as otherwise expressly provided in this part, the procedure shall be the same as in other civil actions." In that connection, a governmental entity, as the plaintiff, has the initial burden of proving that the taking is for a public use or purpose, in accordance with article I, section 20 of the Hawai'i Constitution and HRS § 101–2 (1993), which provides, in pertinent part, that "[p]rivate property may be taken for a public use." *See In re Lorenzo's Estate,* 61 Haw. 236, 246 n. 20, 602 P.2d 521, 529 n. 20 (1979) (explaining that "[t]he burden of producing evidence is usually cast first upon the party who has pleaded the existence of the fact"). Once the government has met that burden, the property owner may defend against the condemnation action. *See id.* (noting that the burden of proof "may shift to the adversary when the pleader has discharged his initial burden").

**27.** The decisions of other jurisdictions are in accord with this rule. *See, e.g., Opus Nw., L.L.C. v. Minneapolis Cmty. Dev. Agency,* 599 N.W.2d 582, 584 (Minn.Ct.App.1999) (explaining that "[g]enerally, challenges to a condemnation proceeding involve a challenge to the public purpose supporting the taking or a challenge to the amount of compensation for the taking"); *Las Vegas Downtown Redev. Agency v. Pappas,* 119 Nev. 429, 76 P.3d 1, 14 (2003) (holding that "[a] property owner may raise, as an affirmative defense to the taking ... [, that] the avowed public purpose is merely a pretext or used in bad faith" (footnotes omitted)); *Ottofaro v. City of Hampton,* 265 Va. 26, 574 S.E.2d 235, 237 (2003) (concluding that "the fact that the City filed with its petition for condemnation a resolution that stated that the landowners' property would be taken for a public use does not bar judicial review of the issue of public use").

Although NLDC was able to negotiate private transfers with most of the private property owners whose lands were needed for the revitalization development, it was unable to reach agreements related to fifteen parcels. *Id.* at 475, 125 S.Ct. 2655. Accordingly, NLDC invoked the City's condemnation power, which had been granted to it for purposes of acquiring the land needed for the revitalization project, and instituted proceedings to obtain those parcels. *Id.* The owners (petitioners in *Kelo*) objected to the takings, claiming that they violated "the 'public use' restriction in the [f]ifth [a]mendment." *Id.*

## 2.

The majority in *Kelo* held that New London's redevelopment "plan unquestionably serve[d] a public purpose" such that the condemnation of the petitioners' properties was permissible under the fifth amendment's takings clause. *Id.* at 484, 125 S.Ct. 2655. The facts of *Kelo* are distinguishable from the instant case insofar as the Court was considering the constitutionality of using eminent domain to condemn unblighted property as part of an economic rejuvenation plan. *See id.* at 472–73, 483, 125 S.Ct. 2655. Nevertheless, like *Kelo*, this case contains a salient feature, *viz.*, the fact that the condemned property would be transferred from one private party to another, at least initially.[28] *See id.* at 476 n. 4, 125 S.Ct. 2655. In that light, the reasoning of Justice Stevens' majority opinion is informative.

Justice Stevens commenced his analysis with the juxtaposition of two "perfectly clear" "polar propositions." *Id.* at 477, 125 S.Ct. 2655. First, that the government "may not take the property of *A* for the sole purpose of transferring it to another private party *B*[.]" *Id.* Second, that the government "may transfer property from one private party to another if 'use by the public' is the purpose of the taking[.]" *Id.* The majority then noted that the "use by the public" standard had evolved from a "literal requirement" in the nineteenth century to a "public purpose" test

at the turn of the twentieth century. *Id.* at 479–80, 125 S.Ct. 2655. Accordingly, the question presented in *Kelo* was "whether the City's development plan serve[d] a 'public purpose.'" *Id.* at 480, 125 S.Ct. 2655.

In that connection, the majority surveyed prior redevelopment cases wherein the Court had determined that a valid public purpose supported the condemnation, despite at least initial transfer to a private party. For example, in *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), the Court had upheld a plan to redevelop "a blighted area of Washington, D.C.," despite the fact that a portion of the property "would be leased or sold to private parties for the purpose of redevelopment[.]" *Kelo*, 545 U.S. at 480, 125 S.Ct. 2655. Similarly, in *Midkiff*, the Court reviewed "a Hawaii statute whereby fee title was taken from lessors and transferred to lessees (for just compensation) in order to reduce the concentration of land ownership." *Kelo*, 545 U.S. at 481, 125 S.Ct. 2655 (citing *Midkiff*, 467 U.S. 229, 104 S.Ct. 2321). Deferring to the legislature's judgment, the Court concluded that eliminating the "'land oligopoly' ... [was] a valid public use ... [and] rejected the contention that the mere fact that the State immediately transferred the properties to private individuals upon condemnation somehow diminished the public character of the taking." *Id.* at 482, 125 S.Ct. 2655 (quoting *Midkiff*, 467 U.S. at 241–42, 104 S.Ct. 2321).

Finally, the *Kelo* majority reviewed *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). In that case, the Court upheld "the provisions of the Federal Insecticide, Fungicide, and Rodenticide Act under which the Environmental Protection Agency could consider data (including trade secrets) submitted by a prior pesticide applicant in evaluating a subsequent application, so long as the second applicant paid just compensation for the data." *Kelo*, 545 U.S. at 482, 125 S.Ct. 2655 (citing *Ruckelshaus*, 467 U.S. at 1014, 104 S.Ct. 2862). The Court

---

**28.** As noted, in the instant case, property condemned pursuant to the Development Agreement is to be transferred initially to Oceanside, a private corporation. However, Paragraph 14 of the Development Agreement requires Oceanside to dedicate the Bypass to Appellee upon its completion. Thereafter, Appellee will "assume all responsibility and costs for operation, maintenance, repair, or reconstruction of the [Bypass]."

concluded that the law passed constitutional muster under *Berman* and *Midkiff* because Congress' intent of increasing competition by eliminating the expense of research satisfied the "public purpose" test. *See id.* (citing *Ruckelshaus*, 467 U.S. at 1015, 104 S.Ct. 2862). The *Kelo* majority summarized the Court's public purpose jurisprudence as "wisely eschew[ing] rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." *Id.* at 483, 125 S.Ct. 2655.

Applying its precedent to the facts presented in *Kelo*, the Court first noted that the City's "determination that the area was sufficiently distressed to justify a program of economic rejuvenation" was entitled to judicial deference. *Id.* The majority then determined that it was necessary to consider the public purpose of the entire redevelopment project, not just the condemnation of the petitioners' specific properties. *Id.* at 484, 125 S.Ct. 2655. The majority rejected the petitioners' proposed "bright-line rule that economic development does not qualify as a public use." *Id.* In that connection, the majority noted that "[p]romoting economic development is a traditional and long-accepted function of government" such that there was "no principled way of distinguishing economic development from the other public purposes that [the Court] has recognized." *Id.* Accordingly, the majority concluded that "[i]t would be incongruous to hold that the City's

interest in the economic benefits to be derived from the development of the Fort Trumbull area has less of a public character than any of those other interests." *Id.* at 485, 125 S.Ct. 2655.

With regard to the petitioners' argument that the taking was improper because private parties might benefit from the redevelopment of New London, the majority opined that "the government's pursuit of a public purpose will often benefit individual private parties." *Id.* The majority cited (1) the transfer of rail track from one private party to another to "facilitat[e] Amtrak's rail service" in *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 422, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992), and (2) "the provision of legal services to the poor" in *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003), as instances in which "the achievement of a public good ... coincide[d] with the immediate benefitting of private parties." *Kelo*, 545 U.S. at 485 n. 14, 125 S.Ct. 2655. The majority concluded that the legislative body was authorized to determine that the public purpose would be best effectuated by a private entity. *See id.* at 486, 125 S.Ct. 2655. Accordingly, it reasoned that it "[could not] say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." *Id.* (internal quotation marks, citation, and footnote omitted).[29]

---

**29.** Justice Thomas, in his separate dissent, primarily took issue with the majority's "exten[sion of] the concept of public purpose to encompass any economically beneficial goal," *Kelo*, 545 U.S. at 521, 125 S.Ct. 2655 (Thomas, J., dissenting), because, *inter alia*, it "eliminate[d] liberties expressly enumerated in the Constitution," *id.* at 506, 125 S.Ct. 2655, and the resultant "losses will fall disproportionately on poor communities[,]" *id.* at 521, 125 S.Ct. 2655. Justice Thomas therefore advanced a strict interpretation of the fifth amendment, stating that "[t]he most natural reading of the [Public Use] Clause is that it allows the government to take property only if the government owns, or the public has a *legal right to use the property,* as opposed to taking it for any public purpose or necessity whatsoever." *Id.* at 508, 125 S.Ct. 2655 (emphasis added). Inasmuch as there is no dispute in the instant case that the public has a legal right to use the property in question because it will become a

county road, the Thomas dissent is not particularly germane.

Nonetheless, the Thomas dissent supports the remand of this case for a determination by the court on the issue of public use. The dissent notes that "[t]here is no justification ... for affording almost insurmountable deference to legislative conclusions that a use serves a 'public use.'" *Id.* at 517, 125 S.Ct. 2655. That dissent explained that "[o]nce one accepts, as the Court at least nominally does, that the [p]ublic [u]se [c]lause is a limit on the eminent domain power of the Federal Government and the States, there is no justification for the almost complete deference it grants to legislatures as to what satisfies it." *Id.* at 518, 125 S.Ct. 2655 (citation omitted). Thus, under the view of the Thomas dissent, it would be error for the court to decline to look beyond the legislative findings in ruling on the issue of whether the public use requirement was satisfied.

The *Kelo* majority explicitly stated what that case did not hold. First, it noted that *Kelo* did not present a case in which property was transferred from private owner *A* to private owner *B* "for the sole reason that citizen *B* will put the property to a more productive use and thus pay more taxes." *Id.* at 486–87, 125 S.Ct. 2655. Second, the majority rejected the petitioners' argument that, in redevelopment cases, the Court "should require a 'reasonable certainty' that the expected public benefits will actually accrue." *Id.* at 487, 125 S.Ct. 2655. Third, the Court declared that it would not "second-guess the [government's] determinations as to what lands it needs to acquire in order to effectuate the project." *Id.* at 488–89, 125 S.Ct. 2655. Finally, the Court "emphasize[d] that nothing in [its] opinion precludes any State from placing further restrictions on its exercise of the takings power[,]" noting that "many States already impose 'public use' requirements that are stricter than the federal baseline." *Id.* at 489, 125 S.Ct. 2655. In that connection, the Court held that New London's condemnation of the petitioners' property satisfied the baseline of the fifth amendment's "public use" requirement. *Id.* at 490, 125 S.Ct. 2655.[30]

Justice Kennedy joined the majority opinion and also concurred separately to elaborate on pretextual public purposes. *See id.* at 490–93, 125 S.Ct. 2655 (Kennedy, J., concurring). He declared that the traditional fifth amendment test requiring that the asserted public use be "rationally related to a conceivable public purpose" does not authorize takings for the benefit of private parties with public benefits that are merely "incidental or pretextual[.]" *Id.* at 490, 125 S.Ct. 2655 (internal quotation marks and citation omitted). Justice Kennedy opined that "[a] court applying rational-basis review under the [p]ublic [u]se [c]lause should strike down a taking that, *by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits[.]*" *Id.* at 491, 125 S.Ct. 2655 (emphasis added). Therefore, Justice Kennedy would require courts presented with "a plausible accusation of impermissible favoritism to private parties" to "treat the objection as a serious one and review the record to see if it has merit, though with the presumption that the government's actions were reasonable and intended to serve a public purpose." *Id.*

Appellant urges this court to adopt this position, arguing that "[the court] should not have stopped at Resolution [No.] 31–03, but

---

30. Justice O'Connor, in a dissenting opinion joined by Chief Justice Rehnquist and Justices Scalia and Thomas, criticized the majority opinion because "[u]nder the banner of economic development, all private property is now vulnerable to being taken and transferred to another private owner" where the property will be "given to an owner who will use it in a way that the legislature deems more beneficial to the public[.]" *Id.* at 494, 125 S.Ct. 2655 (O'Connor, J., dissenting). The O'Connor dissent recognizes "two distinct conditions" pursuant to the fifth amendment for the exercise of eminent domain powers: (1) "the taking must be for a public use" and (2) "just compensation must be paid to the owner." *Id.* at 496, 125 S.Ct. 2655 (internal quotation marks, citation, and brackets omitted). The dissent noted that "[o]ur cases have generally identified three categories of takings that comply with the public use requirement" which include (1) "public ownership" cases where "the sovereign may transfer private property to public ownership—such as for a road, a hospital, or a military base[,]" (2) "use-by-the-public" cases where "the sovereign may transfer private property to private parties, often common carriers, who make the property available for the public's use—such as with a railroad, a public utility, or a

stadium[,]" and (3) where the takings "serve a public purpose … even if the property is destined for subsequent private use." *Id.* at 497–98, 125 S.Ct. 2655.

While Justice O'Connor's dissent enumerated instances of property takings that satisfied the "public use" requirement, it does not appear that she intended this list to constitute a bright line test under which takings akin to the identified instances should automatically be deemed to fulfill the "public use" condition. *See id.* at 497, 500, 125 S.Ct. 2655. Thus, that the property in the instant case is being taken for the construction of a road and thereby falls into the "public ownership" category of cases historically deemed to meet the "public use" requirement, is not dispositive of the "public use" issue.

Furthermore, the O'Connor dissent states that while "[w]e give considerable deference to legislatures' determinations about what governmental activities will advantage the public[,]" nonetheless, "[a]n external judicial check on how the public use requirement is interpreted, however limited, is necessary[.]" *Id.* at 497, 125 S.Ct. 2655. That dissent cautioned that "nearly any lawful use of real private property can be said to generate some incidental benefit to the public." *Id.* at 501, 125 S.Ct. 2655.

should have followed the roadmap to analyzing claims of pretext laid out by Justice Kennedy in his concurring opinion in *Kelo*[.]" However, as discussed *infra*, the majority opinion in *Kelo*, as well as our own cases, provide ample authority to require the court to reach the issue of pretext.

Therefore, we decline to adopt Justice Kennedy's concurring opinion.

## VI.

Despite finding that a public purpose existed on the facts presented in *Kelo*, the Supreme Court reaffirmed that the government could not condemn private property for the sole purpose of transferring title to a different private owner. *Id.* at 477, 125 S.Ct. 2655. Justice Stevens explained with respect to the pretext defense that

> the City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party. *See Midkiff*, 467 U.S. [ ] at 245[, 104 S.Ct. 2321] ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void"). *Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit.* ... The trial judge and all the members of the Supreme Court of Connecticut agreed that *there was no evidence of an illegitimate purpose in this case.*

*Id.* at 477–78, 125 S.Ct. 2655 (emphases added) (citation and footnote omitted).

Courts have interpreted this statement to mean that, under the appropriate circumstances, the *Kelo* majority would review the asserted public purpose of a taking to evaluate its veracity in the face of a pretext challenge. For example, the Court of Appeals for the District of Columbia opined that the majority

> recognized that there may be situations where a court should not take at face value what the legislature has said. The government will rarely acknowledge that it is acting for a forbidden reason, so *a property owner must in some circumstances be allowed to allege and to demonstrate that the stated public purpose for the condemnation is pretextual.* It may be difficult to make this showing, and the Supreme Court's decision may raise many more questions than it answers, but *a pretext defense is not necessarily foreclosed by Kelo.*

*Franco v. Nat'l Capital Revitalization Corp.*, 930 A.2d 160, 169 (D.C.2007) (emphases added) (internal quotation marks omitted).[31] In reaching the conclusion that pretext was a valid defense to condemnation, that court explicitly clarified that it was "apply[ing] the decision of the *Kelo* majority, written by Justice Stevens[,]" and not adopting Justice Kennedy's concurrence. *Id.* at 169 n. 8.

Similarly, the Second Circuit Court of Appeals, also interpreting the majority opinion in *Kelo*, rejected a pretext claim "founded only on mere suspicion," *Goldstein v. Pataki*, 516 F.3d 50, 62 (2d Cir.2008), *cert. denied*, —— U.S. ——, 128 S.Ct. 2964, 171 L.Ed.2d 906 (2008), but left open "the possibility that *a fact pattern may one day arise*

**31.** Related to the belief that *Kelo* did not "foreclose" the possibility of successful pretext defenses, it is noteworthy that some state courts expressly allowed the defense even before the Supreme Court announced its decision in *Kelo*. *See, e.g., City of Atlanta v. Fulton County*, 210 Ga. 784, 82 S.E.2d 850, 852 (1954) (reiterating the holding that *"in case of gross abuse of [the eminent domain power], as when, under the pretext of public utility*, the property of A is taken and given to B, the Courts will interfere and set aside the law" (emphasis added) (internal quotation marks and citation omitted); *Pappas*, 76 P.3d at 14 (explaining that "[a] property owner may raise, as an affirmative defense to the taking, that ... *the avowed public purpose is merely*

*a pretext* or used in bad faith" (footnotes omitted)(emphasis added)). Additionally, Georgia provided statutory relief from pretextual takings. *See Nations v. Downtown Dev. Auth. of Atlanta*, 255 Ga. 324, 338 S.E.2d 240, 245 (1985) (holding that, generally, the legislature has the authority "to determine when the right of eminent domain may be exercised[ ]" but *"[i]f ... under pretext of such necessity the General Assembly should pass a law authorizing the taking of property for private use rather than for public use, the courts should declare the law inoperative"* (quoting Official Code of Georgia Annotated § 22–1–3) (emphasis added) (internal quotation marks omitted))).

*in which* the circumstances of the approval process so greatly undermine the basic legitimacy of the outcome reached that *a closer objective scrutiny of the justification being offered is required*," *id.* at 63 (emphases added).

In several cases decided shortly before *Kelo*, federal district courts did, in fact, scrutinize asserted public purposes. *See Aaron v. Target Corp.*, 269 F.Supp.2d 1162, 1177 (E.D.Mo.2003) (stating that property owners had "shown at least a serious question on the merits of their takings claim on public use grounds" where their property was to be condemned and transferred to another private party for use as a retail store), *rev'd on other grounds by* 357 F.3d 768, 777 (8th Cir.2004); *Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F.Supp.2d 1203, 1230 (C.D.Cal.2002) (concluding that the property owner had demonstrated "at least a fair question" that the challenged condemnation lacked a valid public purpose where the property was to be turned over to "Costco");

**32.** In this connection, the character of the proposed public use, *i.e.*, a public road, is itself strong evidence mitigating in favor of the presumption of validity. Indisputably, public roads have long been recognized as a public purpose for which private property may be condemned. *See, e.g., Rindge Co. v. Los Angeles County*, 262 U.S. 700, 706, 43 S.Ct. 689, 67 L.Ed. 1186 (1923) ("That a taking of property for a highway is a taking for public use has been universally recognized, from time immemorial."); *Bailey v. Myers*, 206 Ariz. 224, 76 P.3d 898, 902 (Ct.App.2003) (explaining that "[w]hen the government proposes to take a person's property to build streets, jails, government buildings, libraries or public parks that the government will own or operate, the anticipated use is unquestionably public"); *Cochran v. State*, 859 N.E.2d 727, 731 (Ind.Ct. App.2007) (holding that the "State had the power to exercise eminent domain over [the appellant's] property for the purposes of constructing drainage facilities outside of the street limits as a part of its [highway] reconstruction project"); *City of Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242, 701 N.W.2d 144, 150–51 (2005) (holding that a road "is a public highway" for which "the legislature may constitutionally authorize the condemnation of land" if it "has been established by public authority, and the damages for the condemnation of the land has been paid by the general public, and the road is under the control and management of public officers, whose duty it is to keep it in repair" (citation omitted)); *Township of W. Orange v. 769 Assocs., L.L.C.*, 172 N.J. 564, 800 A.2d 86, 91 (2002) (reiterating that "[c]ourts have long held that the condemnation of private property for use as a

*99 Cents Only Stores v. Lancaster Redev. Agency*, 237 F.Supp.2d 1123, 1130 (C.D.Cal. 2001) (rejecting the condemnor's argument that condemnation was supported by the public purpose of preventing blight because, *inter alia*, there was "no evidence in the record to suggest that so-called 'future blight' was the actual reason underlying" the condemnation action).

### A.

 Under our precedents and *Kelo*, it appears that the stated public purpose in this case on its face comports with the public use requirements of both the Hawai'i and United States constitutions. The *Kelo* decision confirms that the fact that the condemned property is transferred from one private owner to another does not, *a fortiori*, invalidate the taking. Moreover, the public purpose of the Bypass is evident from its nature as a public road,[32] consistent with the land use plans.

public road fulfills the public use requirement" (citation omitted)); *Ottofaro*, 574 S.E.2d at 238 (holding that where "the City own[ed] the road, and ... the road [was] open for use to the public," the appellant's land had been condemned for a public purpose); *Ford v. Dickerson*, 222 W.Va. 61, 662 S.E.2d 503, 506 (2008) (listing condemnation as one of three means by which "the public may acquire a valid right to use land owned by another as and for a public road or highway" (internal quotation marks and citation omitted)).

But "the single fact that a project is a road does not per se make it a *public* road." *City of Novi*, 701 N.W.2d at 150 (emphasis in original). In that connection, the Michigan Supreme Court has explained that

the difference between public and private use in the context of roads depends largely upon whether the property condemned is under the direct control and use of the government or public officers of the government, or, what is almost the same thing, in the direct use and occupation of the public at large, though under the control of private persons or of a corporation[.]

*Id.* (internal quotation marks, citations, and ellipses points omitted). Applying the aforementioned factors, it is noted that (1) under the Development Agreement, the Bypass is to be dedicated to Appellee, which will assume control and responsibility for its maintenance, and (2) the Bypass will be available for "direct use and occupation of the public at large[.]" *See id.*

However, even when considering a condemnation action for the purpose of constructing a

In that connection, the "prima facie evidence" of the Bypass's public purpose, as delineated in Resolution No. 31–03, includes: (1) the determination in the Kona Regional Plan that "the current Māmalahoa Highway [is] inadequate to handle the volume of traffic currently traversing on the roadway"; (2) the declaration that "the proposed Māmalahoa Bypass had been determined by [Appellee], through its County Council, as providing a regional benefit for a public purpose and use which will benefit" the community; and (3) the resolution "that it is necessary for the public use and purpose, to wit: the construction and development of a road intended to bypass the Māmalahoa Highway in the approximate vicinity between Keauhou and Captain Cook, Kona, to acquire and condemn" Appellant's property. Thus, it appears that Appellee presented sufficient *prima facie* evidence of public purpose under a rational relationship test. *See Lyman*, 68 Haw. at 68, 704 P.2d at 896.

### B.

However, both *Ajimine* and *Kelo* make it apparent that, although the government's stated public purpose is subject to prima facie acceptance, it need not be taken at face value where there is evidence that the stated purpose might be pretextual. *See Ajimine*, 39 Haw. at 550 (holding that "where ... the [l]egislature declares a particular use to be a public use[,] the presumption is in favor of

public road, "[t]here is no mechanical formula for determining 'public use.' This issue must be decided on a case-by-case basis." *Bailey*, 76 P.3d at 902 (citation omitted).

33. The dissent cites to Kennedy's concurring opinion for the proposition that the burden for rebutting prima facie evidence of public purpose is a "clear showing." *See* dissenting opinion at 391, 393, 198 P.3d at 654, 656 (citing *Kelo*, 545 U.S. at 491, 125 S.Ct. 2655) (Kennedy, J., concurring). However, *Ajimine* also indicates that a burden-shifting regime is appropriate by referring to a "presumption" in favor of the legislature, whose determination is subject to "prima facie acceptance," which is "binding" unless that presumption is rebutted by evidence that "such use is clearly and palpably of a private character." *See Ajimine*, 39 Haw. at 549–50.

34. It appears that the court's basis for invalidating Condemnation 1 as lacking a valid public purpose rested predominantly, if not exclusively,

this declaration ... unless such use is *clearly and palpably of a private character*[,]" however, "that does not mean that either the decision of the legislature or the presumption is conclusive, for *the issue of public use is a judicial question and one of law to be decided on the facts and circumstances of each particular case*" (internal quotation marks and citation omitted) (emphases added)); [33] *see also Kelo*, 545 U.S. at 478, 125 S.Ct. 2655 (stating that a taking is not valid if the asserted purpose is a "mere pretext of a public purpose, when its actual purpose [is] to bestow a private benefit").

Appellant's objection to Condemnation 2 is not that the asserted public purpose is invalid on its face, but that the public purpose was pretextual. It argues that Condemnation 2 provided a "predominately private benefit ... to Oceanside." In that vein, Appellant contends on appeal that

[i]n Condemnation [2], the [court] did not look beyond County's Resolution 31–03 to conclude that it satisfied both the federal and Hawaii public use requirements. It was required to do more and address [Appellant's] claim that the asserted public purpose was a *pretext*—as in Condemnation 1—*to hide the predominantly private benefit of the Hokuli'a access road to Oceanside* [, e]specially since it struck down the attempted taking in Condemnation [1] for lack of public use. [34]

on the court's conclusion that the taking represented an illegal delegation of Appellee's eminent domain power to Oceanside. The court's order stated, in pertinent part, that "[Condemnation 1] is invalid ... because County Resolution 266–00 *illegally delegated* its power of condemnation, through the Development Agreement, to [Oceanside], and *therefore did not have a proper public purpose*." (Emphases added.) However, courts generally speak of illegal delegation and public purpose as two distinct considerations. Either illegal delegation, *or* lack of a valid public purpose, will invalidate a taking. It is unclear from the court's findings and conclusions whether there were additional considerations that led the court to conclude that Condemnation 1 lacked a valid public purpose, *i.e.*, private benefit to Oceanside. However, Condemnation 1 was not appealed and therefore is final and binding. *See Hoopai v. Civil Service Com'n*, 106 Hawai'i 205, 224, 103 P.3d 365, 384 (2004) ("A judgment is final and binding unless an appeal is taken.") Therefore, we only consider whether Appellant's

(Emphases added.) Accordingly, Appellants argue that "the [court] should not have stopped at Resolution 31–03, but should have followed the roadmap to analyzing claims of pretext[.]"

Appellee argues alternatively that the "court properly found public purpose." It asserts that "[a]t trial, [Appellant's] private benefit arguments were: (1) [Appellee] changed the Bypass's northern terminus from mauka at Kuakini Highway to makai at Ali'i Highway to benefit Oceanside to the detriment of [Appellee]; and (2) Oceanside (and not [Appellee]) determined the alignment of the Bypass." According to Appellee, "the [court] did not fail to analyze these private benefit allegations[,]" as the court

> specifically found that the "alignment of the [Bypass], with a northern terminus at Alii Highway was preferred and selected by [Appellee's] Department of Public Works, and is consistent with the General Plans that have been adopted by [Appellee]" and in "County Resolution No. 31–03, the final determination of the [bypass] remained with [Appellee's] Department of Public Works."

Despite Appellee's argument, it is unclear from the entirety of the court's findings and conclusions regarding Condemnation 2 whether the court did in fact consider and reject Appellant's pretext argument. The *findings* relating to "public purpose" in Condemnation 2 are as follows:

> 96. The eminent domain action in [Condemnation 2] has County Resolution No. 31–03 as its basis for public purpose.
>
> 97. County Resolution No. 31–03 states that the proposed construction and use of the [Bypass] would provide a public benefit to the County of Hawaii.
>
> 98. The [HCC] approved of the [Bypass] to be a public purpose and passed County Resolution No. 31–03 on February 5, 2003.
>
> 99. The 2003 County Council was composed of the following nine members. . . .
>
> 100. The [Bypass] was to be built to State Highway Design Standards.
>
> 101. The alignment of the [Bypass], with a northern terminus at Alii Highway was

pretext argument was fully considered as to Con-

preferred and selected by [Appellee's] Department of Public Works, and is consistent with the General Plans that have been adopted by [Appellee].

> 102. In County Resolution No. 31–03, the final determination of the [Bypass] remained with [Appellee's] Department of Public Works.

(Citations omitted.) The *conclusions* of the court regarding Condemnation 2 relating to "public purpose" are the following:

> 94. The Fifth Amendment to the [U.S.] Constitution provides, in part, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.
>
> 95. The Hawaii Constitution states, "Private property shall not be taken or damaged for public use without just compensation." Haw. Const. art. I, § 20.
>
> 96. When applying the Hawaii Constitution, Hawaii courts may interpret it to afford greater protection than provided by the U.S. Constitution. *See [Lyman]*, 68 Haw. 55[, 704 P.2d 888].
>
> 97. The inquiry under the public use clause of [a]rticle I, [s]ection 20 is whether a taking is designed to further a "legitimate government purpose." *Housing Finance & Dev. Corp. v. Castle*, 79 [Hawai'i] 64[, 888 P.2d 576] (1992[1995]).
>
> 98. Generally, courts are bound by the legislature's public use determination unless the use is clearly and palpably of a private character. *State v. Anderson*, 56 Haw. 566[, 545 P.2d 1175] (1976). However, the public use question is still one that remains judicial in nature. *[Ajimine]*, 39 Haw. 543[ ].
>
> 99. The [HCC] determined that there was a public purpose in County Resolution 31–03. County Resolution 31–03 did not refer to the Development Agreement, and was passed by a new County Council with a different Council make-up.
>
> 100. [Appellant] timely raised [its] objection to public purpose within the ten-day limit in [Condemnation 2]; [Appellee] did not raise this issue.

demnation 2.

101. County Resolution 31–03 is valid.

102. The [c]ourt concludes that the eminent domain action in [Condemnation 2] is validly supported by public purpose, and properly passed by the [HCC].

(Internal reference omitted.)

With all due respect, the court's conclusion that Condemnation 2's public purpose was valid, because the resolution upon which it was based omitted reference to the Development Agreement and was passed by a slightly altered HCC, may have elevated form over substance. *See Coon v. City & County of Honolulu*, 98 Hawai'i 233, 254, 47 P.3d 348, 369 (2002) (reaffirming this court's policy of "eschew[ing]" constructions that "elevate form over substance"). In this connection, Appellant asserts that the court's findings and conclusions "are devoid of any reference to evidence regarding public use beyond the fact [that] the second resolution does not use the words 'Development Agreement,' and the resolution was approved by a county council comprised of different members." Despite the lack of reference to the Development Agreement in Resolution No. 31–03, it is not apparent from the record whether any or all of the same provisions in the Agreement that led the court to invalidate Condemnation 1 were still in effect and underlay Condemnation 2,[35] or whether other conditions existed such that the private character predominated. Those issues may be factors relevant to the pretext issue.

In its conclusion 71 related to Condemnation 1, the court stated that "[a] court applying rational-basis review under the [p]ublic [u]se [c]lause should strike down a taking that, by a clear showing, is tended to favor a

35. The court invalidated the impact fee and condemnation provisions of the Development Agreement. Pertinent to reimbursement to Oceanside for developing the Bypass, Paragraph 15.a. of the Development Agreement provided that "nothing herein shall be construed as preventing Oceanside from seeking reimbursement" from Appellee for "the difference between the [t]otal [c]ost of the [Bypass] and the 'Project Impact Cost[.]'" Paragraph 15.c of the Development Agreement declared that Oceanside would be reimbursed with funds from (1) "fair share" assessments levied against future developments as conditions of development, (2) an impact fee that could be levied against Hawai'i County "or the region extending from Keauhou to Milolii," or (3) "any other monetary contribution paid to [Appellee] from developers or land owners" who benefit from the construction of the Bypass. With regard to those provisions of the Development Agreement that provided for the collection of fees by the County, the court concluded:

81. The Development Agreement also purports to amend, supersede or substitute for ordinances and the impact fee statute. The Development Agreement imposes an impact fee, and [Appellee] has not enacted an impact fee ordinance pursuant to section 46–141 of the [HRS], as amended. [HRS] § 46–141.
. . . .
84. [Appellee] does not have statutory authority to impose a "fair share" assessment, but has statutory authority to enact impact fee ordinances pursuant to section 46–141 of the [HRS], as amended.

85. The "fair share" assessment under the Development Agreement, in substance, is tantamount to an impact fee that does not conform to Section 46–141 of the [HRS], as amended.

86. The portion of the Development Agreement that imposes the "fair share" assessment against [Appellant] is void for not being in compliance with Section 46–141 of the [HRS], as amended.

Therefore, the "fair share" and impact fee provisions of the Development Agreement, as applied to Appellant, were declared void. The future vitality of such provisions, assuming compliance with HRS § 46–141 (Supp.2007), is not clear.

Additionally, the court concluded that all of the condemnation provisions were illegal. The relevant conclusions are as follows:

78. [Appellee] and Oceanside's actions prior to, and performance after, the adoption of the Development Agreement, *as well as the language within the Development Agreement make it unmistakably clear that [Appellee] improperly delegated condemnation authority to Oceanside.*

79. The condemnation provisions of the Development Agreement are *invalid because it improperly delegates condemnation authority to a private party.*

(Emphases added.) It is not evident from the record whether the invalidated condemnation and impact fee provisions were still in effect at the time Condemnation 2 was instituted.

Other than the condemnation and "fair share" provisions, it appears the remainder of the Agreement was left in place. As for the remaining provisions, including whether Oceanside was required to designate the area for the Bypass, negotiate with landowners, complete and cover all costs of construction of the Bypass, dedicate the Bypass to Appellee, and receive some reimbursement from Appellee for costs associated with the Bypass (via some monetary contribution other than the invalidated impact fee provisions), it is also unclear as to whether these are still in effect between Appellee and Oceanside with respect to Condemnation 2.

particular private party, with only incidental or *pretextual public benefits*[.]" (Quoting *Kelo*, 545 U.S. at 491, 125 S.Ct. 2655 (Kennedy, J., concurring).) (Emphasis added.) Despite the court's reference to pretext in Condemnation 1, it is not evident whether the court engaged in a "pretext" analysis as to whether Condemnation 1 provided a predominantly private benefit to Oceanside, or merely concluded that the condemnation was void because it was an illegal delegation.

Moreover, it is not apparent why the court referred to pretext in its conclusions with respect to Condemnation 1 but not with respect to Condemnation 2. As to Condemnation 2, although the court referenced the relevant standards from *Anderson* and *Ajimine*, it is not discernible that the court based its determination of public purpose on anything more than the fact that "*County Resolution No. 31–03 states* that the proposed construction and use of the [Bypass] would provide a public benefit to the County of Hawaii" and that "*[t]he [HCC] determined* that there was a public purpose in County Resolution 31–03." (Emphases added.) The court did not state that Appellant failed to make a clear showing that the use was of a predominantly private character, or indicate any recognition that despite any ostensible private benefit to Oceanside, the actual purpose was a valid public use. Contrary to Appellee's assertions and the dissent, in Condemnation 2 the court did not expressly consider the question of whether the taking was "clearly and palpably of a private character," *Ajimine*, 39 Haw. at 550 (internal quotation marks and citation omitted), and determine that it was not.

C.

 The dissent states that "our own case law demonstrates that the rational-basis test—identical to that laid out in the federal precedent—is the appropriate standard to be applied in determining whether a governmental taking has a public purpose under the public use clause of the Hawaiʻi Constitution, as well as the federal constitution." Dissenting opinion at 394, 198 P.3d at 657. However, where the actual purpose of a condemnation action is to bestow a benefit on a private party, there can be no rational basis for the taking. *See Kelo*, 545 U.S. at 477–78, 125 S.Ct. 2655; *Ajimine*, 39 Haw. at 550.

According to the dissent, "[i]t is well-settled that, 'whenever property is taken for a highway, it is for the public use, *notwithstanding that the highway may greatly benefit a private party*[,]'" dissenting opinion at 395, 198 P.3d at 658 (quoting *Rodgers Dev. Co. v. Town of Tilton*, 147 N.H. 57, 781 A.2d 1029, 1034 (2001)) (emphasis in original), and also, the project is not "an economic development condemnation" as in *Kelo, id.* at 397, 198 P.3d at 660. It appears, therefore, that the dissent would foreclose all pretext arguments where the government's stated public purpose is a "classic" public use, such as a road, and that the dissent believes that pretext arguments should be confined to cases where the condemnation is for the purpose of economic development. *See id.* at 397–98, 198 P.3d at 660–61.

Plainly it was not the intention of this court in *Ajimine* or of the Supreme Court in *Kelo* to foreclose the possibility of pretext arguments merely because the stated purpose is a "classic" one. According to *Ajimine*, although the legislative determination is subject to prima facie acceptance, "that does not mean that either the decision of the legislature or the presumption is conclusive, for the issue of public use is a *judicial question and one of law to be decided on the facts and circumstances of each particular case.*" 39 Haw. at 550 (emphasis added). Under the dissent's formulation, it is difficult to imagine what question would be left for the court to decide when the stated purpose of the taking is a public road. Similarly, in *Kelo* the majority stated that "the City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party . . . [, n]or would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." 545 U.S. at 477–78, 125 S.Ct. 2655. There is no indication that this proposition was limited to economic development cases such as in *Kelo*. Indeed, the dissent's attempt to distinguish between "classic" public uses and "economic development" condemnations

conflicts with the majority opinion. In *Kelo*, Justice Stevens determined that "[p]romoting *economic development is a traditional and long-accepted function* of government. There is, moreover, *no principled way of distinguishing economic development from the other public purposes that we have recognized.*" *Id.* at 484, 125 S.Ct. 2655 (emphases added). Therefore, the dissent has no basis for distinguishing "economic development" cases.[36]

Aside from the foregoing it is not established that " 'whenever property is taken for a highway, it is for the public use[.]' " Dissenting opinion at 395, 198 P.3d at 658 (quoting *Rodgers Dev. Co.*, 781 A.2d at 1034). The dissent takes that proposition from a New Hampshire case wherein the New Hampshire Supreme Court interpreted the New Hampshire *state constitution. See Rodgers Dev. Co.*, 781 A.2d at 1034. More consistent with *Ajimine* and *Kelo* are state cases that have determined that simply because the government's stated public purpose is to build a public highway, does not *a fortiori* mean that the taking is for a public use. *See Novi*, 701 N.W.2d at 150. In *Novi*, the Michigan Supreme Court "agree[d] with defendants that the single fact that a project is a road does not per se make it a *public* road." *Id.* (emphasis in original). The court determined that the road at issue in that case was a public use under the Michigan constitution because "the public body establishe[d the] road, pa[id] for it out of public funds, and retain[ed] control, management, and responsibility for its repair." *Id.* at 151. To adopt a per se rule for roads under the public use

clause would deprive the court of its judicial function and therefore clash with *Ajimine*.

▮▮▮▮▮▮ Thus, even where the government's stated purpose is a "classic" one, where the actual purpose is to "confer[ ] a private benefit on a particular private party[,]" the condemnation is forbidden. *See Kelo*, 545 U.S. at 477, 125 S.Ct. 2655. In *Kelo*, the majority was not concerned because "[t]he trial judge and all the members of the Supreme Court of Connecticut agreed that there was no evidence of an illegitimate purpose in this case." *Id.* at 478, 125 S.Ct. 2655. Thus, it was not the case that the Supreme Court was "unwilling to examine the appellants' pretext defense in the face of a taking premised on an economic development plan," dissenting opinion at 395, 198 P.3d at 658, but that such an examination was unnecessary because both the trial court and the state supreme court *had already done so. See Kelo*, 545 U.S. at 478, 125 S.Ct. 2655. On the other hand, in this case, there is no finding or conclusion of the court that "there was no evidence of an illegitimate purpose[,]" *id.*, and therefore, remand is appropriate.

### D.

The dissent relies on *Goldstein* to argue that "inasmuch as the [Bypass] in this case is a classic public use ..., there was no need for a 'full judicial inquiry into the subjective motivation of every official who supported the taking[.]' " Dissenting opinion at 402, 198 P.3d at 665 (brackets omitted) (quoting *Goldstein*, 516 F.3d at 63–64). We doubt that such an inquiry would be workable or permissible and obviously do not mandate one.[37] In *Goldstein*, the Second Circuit took

---

**36.** Therefore, the dissent's attack on our "reliance on a string of federal cases—all relating to economic development condemnations[,]" dissenting opinion at 397, 198 P.3d at 660 (footnote omitted), is misplaced. None of those cases indicate that pretext arguments should be confined to economic development cases. As discussed herein, both *Ajimine* and *Kelo* indicate that where the private character of a taking predominates, it is invalid, regardless of whether it is a "classic" public use. Furthermore, courts have indicated that merely because a taking is a road does not mean that it is *per se* valid. *See Novi*, 701 N.W.2d at 150 (stating that "the single fact that a project is a road does not per se make it a

public road"); *see also Ottofaro*, 574 S.E.2d at 237 (despite holding that road was valid public purpose in that case, recognizing that "whether a taking is for a public purpose is a judicial question, reviewable by the courts" and "the fact that the City filed with its petition for condemnation a resolution that stated that the landowners' property would be taken for a public use does not bar judicial review of the issue of public use").

**37.** In the same vein the dissent argues "that it was not necessary for the trial court to look beyond the face of Resolution 31–03 because the construction of a bypass road that would, unquestionably, benefit the public is a valid public

issue with the fact that the appellants sought "to gain discovery into the process by which the [government] approved this [p]roject . . . [including] depositions of pertinent government officials, along with their emails, confidential communications, and other pre-decisional documents[.]" 516 F.3d at 62.

Indeed, in *Goldstein*, despite that court's concerns that the appellants were seeking "an unprecedented level of intrusion into the process," as the dissent acknowledges, dissenting opinion at 402, 198 P.3d at 665 (quoting *Goldstein*, 516 F.3d at 63), the *Goldstein* court explicitly "preserv[ed] the possibility that a fact pattern may one day arise in which the circumstances of the approval process so greatly undermine the basic legitimacy of the outcome reached that a closer *objective* scrutiny of the justification being offered is required[,]" 516 F.3d at 62–63 (emphasis in original). Unlike the appellants in *Goldstein*, Appellant in this case has not sought to probe in such an intrusive manner, but, as contemplated by *Goldstein*, questions "the basic legitimacy of the outcome" and seeks a "closer *objective* scrutiny of the justification being offered[.]" *See id.*

### E.

We agree with the dissent that "the *ultimate question* . . . is whether [Appellee's] decision to condemn the subject property for the construction of a public bypass road was a *mere pretext for its actual purpose to bestow a private benefit on Oceanside*." Dissenting opinion at 400, 198 P.3d at 662 (emphases added).[38] However, we respectfully part ways with the dissent in its assessment of whether the court actually considered Appellant's pretext argument. The dissent argues that "the *record* indicates . . . that the trial court *did*, in fact, seriously consider

purpose to which Condemnation 2 is rationally related[,]" dissenting opinion at 397, 198 P.3d at 659, and that it "do[es] not believe that this case presents a situation where it is necessary to closely scrutinize the motives of the City Council" because the taking in this case is a "classic public purpose," *id.* at 398, 198 P.3d at 660 "scrutiny [of] the motives of the City Council" or the "subjective motivation of every official," as posited by the dissent.

whether [Appellee's] stated public purpose to build a bypass road to alleviate traffic concerns was a mere pretext for the actual purpose to bestow a private benefit." *Id.* at 399, 198 P.3d at 661 (emphases in original).

### 1.

In support of its argument, the dissent points to the court's findings with respect to Appellee's need for the road, and the finding regarding Oceanside's proposal that, "[r]ecognizing [Appellee's] need for new roads, Oceanside proposed to build the [Bypass] in exchange for a change of zoning for the Hokulia development project." *Id.* at 401, 198 P.3d at 663 (emphasis omitted). The dissent concludes that based on those findings, "[i]n essence, the trial court found that [Appellee] had—*since 1979*—'recognized a need for a road to bypass Māmalahoa Highway.' Additionally, the trial court found that, *based upon Oceanside's awareness of the public need for a bypass road*, it proposed to build the road in exchange for a change in zoning." *Id.* at 401, 198 P.3d at 663 (emphases in original).

However, the above-stated findings do not address Appellant's argument that, despite the stated public purpose, there was a predominantly private benefit to Oceanside, nor do such facts indicate that the court thoroughly considered the pretext argument as to Condemnation 2. Merely because Appellee had recognized the need for a bypass prior to entering into negotiations with Oceanside and Oceanside had in turn capitalized upon that need, does not preclude Appellant's argument that Appellee's subsequent negotiations with Oceanside resulted in an agreement that provided a "predominantly private benefit to Oceanside."

**38.** The dissent also argues that "[Appellee's] determination [in Resolution No. 31–03] that the condemnation is necessary for a public purpose does not, *on its face*, involve an impossibility and is not palpably without reasonable foundation." Dissenting opinion at 397, 198 P.3d at 659 (internal quotation marks and citation omitted) (emphasis in original). Thus, it appears that the dissent agrees with this opinion on that point.

The dissent also accepts as sufficient indication that the court considered and rejected Appellant's pretext argument, the court's conclusions (1) "that Condemnation 2, which did not refer to the [D]evelopment [A]greement, 'stood independently from the Development Agreement, and [ (2) ] that there was sufficient attenuation between the Development Agreement previously mentioned and Resolution No. 31–03[,]' " and, (3) therefore, " 'the County Council determined that there was a public purpose in County Resolution 31–03,' " making Condemnation 2 " 'valid.' " [39] *Id.* at 402, 198 P.3d at 664 (brackets omitted) (quoting Conclusions 93, 99, and 101).

As discussed *supra,* those conclusions appear to take Resolution 31–03 at face value, whereas Appellant's argument raised circumstances beyond the mere face of the Resolution. Furthermore, the Development Agreement may not be the sole source of evidence as to whether the asserted public purpose in Condemnation 2 was pretextual. Rather, the court was obligated to consider any and all evidence that Appellant argued indicating that the private benefit to Oceanside predominated. The court based its conclusion that there was an illegal delegation in Condemnation 1 on the condemnation provisions in the Development Agreement, and therefore, the court's conclusions regarding the "attenuation" between Resolution 31–03 and the Development Agreement seemingly represent only the court's belief that *there was no illegal delegation in Condemnation 2.* It cannot be discerned from the court's findings and conclusions whether the conclusions pointed to by the dissent *actually address the pretext issue.*

### 2.

■ The dissent asserts that "with regard to Condemnation 2, the trial court *determined* that the public purpose was 'that the proposed construction of the bypass road would provide public benefit to the County of Hawaii.' " *Id.* at 402, 198 P.3d at 664 (emphasis added) (quoting Finding No. 97) (brackets omitted). However, contrary to

the dissent's characterization of the court's finding 97, that finding, as related *supra,* actually declares that *"County Resolution No. 31–03 states* that the proposed construction and use of the [Bypass] would provide a public benefit to the County of Hawaii." (Emphasis added.) Therefore, finding 97 does *not* represent the court's independent determination that, *based on the record,* the Bypass was the public purpose underlying the condemnation, but merely relates the *HCC's assertion* in Resolution 31–03 that the Bypass would provide a public benefit.

### 3.

The dissent similarly recasts the court's conclusions 99 and 101, asserting that the court "concluded" that "[i]nasmuch as Condemnation 2 stood independently from the [D]evelopment [A]greement, ... 'the [HCC] determined that there was a public purpose ...,' and, thus, Condemnation 2 was 'valid.' " Dissenting opinion at 402, 198 P.3d at 664 (brackets omitted). However, there is no indication that Conclusions 99 and 101 were in any way based on or related to Conclusion 93, in which the court determined that County Resolution 31–03 stood independently from the Development Agreement. In fact, the court placed Conclusion 93 under the subject heading "Development Agreement," whereas Conclusions 99 and 101 both fall under the separate subject heading "Public Purpose." Thus, it does not "[l]ogically ... follow[ ]," as the dissent argues, that "inasmuch as [the court] concluded that Condemnation 2 was 'sufficiently attenuated' from the [D]evelopment [A]greement, ... [the court] also believed that the [D]evelopment [A]greement was not the 'actual purpose' of Condemnation 2." *Id.* at 402, 198 P.3d at 664 (brackets omitted).

### 4.

Moreover, the conclusions the dissent points to as evidence that the court fully considered pretext have no factual basis in the court's findings. The only facts that

**39.** The dissent expresses confusion in its footnote 6 as to "how the issue of illegal delegation relates to whether the asserted purpose of the taking is a

mere pretext for an actual purpose to bestow a private benefit." *Id.* at 402, 198 P.3d at 664 n. 6 (internal quotation marks and citations omitted).

could support the conclusion that there was "attenuation" between the Development Agreement and Resolution 31–03 are Findings 82 and 99, which indicate that the membership of the HCC had changed between 2000 and 2003, such that four of the nine members were different, and Finding 92, which states that "[n]o reference is made to the Development Agreement in County Resolution [No.] 31–03." The court's conclusions do not indicate that the court actually looked further than the *passage* of Resolution 31–03, or considered factors other than the *language* of that Resolution in order to determine that the stated public purpose was valid. Thus, we must disagree with the dissent's belief that

> the [findings] and [conclusions] demonstrate ... that the trial court did, in fact, examine whether Condemnation 2 was "clearly and palpably of a private character," *Ajimine*, 39 Haw. at 550, and determined that the stated public purpose in Resolution [31–03], *i.e.*, to build a bypass road, was *not* "only incidental" or a mere "pretextual public benefit" to hide the predominantly private benefit of the bypass road to Oceanside.

Dissenting opinion at 402, 198 P.3d at 664 (emphasis in original) (brackets omitted). That interpretation stretches the court's conclusions beyond their language.

### 5.

Finally, the dissent posits that in considering whether the court decided the pretext issue "this court should not limit itself to the four corners of the trial court's [findings] and [conclusions], but also look to the record." *Id.* at 399, 198 P.3d at 661. In this regard, the dissent adopts Appellee's argument on appeal, discussed in more detail *supra*, that the court's findings that " 'the alignment of the [Bypass] ... was preferred and selected by [Appellee,]' " *id.* at 402, 198 P.3d at 664, and that " 'the final determination of the [Bypass] remained with [Appellee,]' " *id.*, demonstrate that "the trial court rejected [Appellant's] actual purpose contention," *id.* at 402, 198 P.3d at 664. However, we cannot agree that it is apparent from the record, *see* dissenting opinion at 400, 198 P.3d at 662, that the court actually decided the pretext

issue when determining that Resolution 31–03 had a valid public purpose, or rather that its determination of a public purpose was simply based on the language of Resolution 31–03 itself, which authorized Condemnation No. 2. As noted *supra*, in Condemnation 1, the court held that the condemnation was an illegal delegation of Appellee's eminent domain power to Oceanside, based upon certain provisions of the Development Agreement. Relevant to *illegal delegation*, the court found that "[t]he Development Agreement [ ] gives Oceanside the ability to designate the private property to be condemned *by allowing Oceanside to '[d]etermine the final Right–of–Way for the alignment of the entire [Bypass]*, including intersection areas[,]' " "the Development Agreement indicates that, at the time the parties entered into the agreement, [Appellee] intended to condemn any private property that *Oceanside has determined, in its sole and absolute discretion, as necessary for the construction of the [Bypass]* [,]" and "*Oceanside identified the property to be condemned* and directed the County to condemn." (Emphases added.)

Thus, any findings the court made in Condemnation 2 with regard to *who* had the power to determine the alignment of the highway, and therefore, which property to condemn, appear intended to clarify that in Condemnation 2, Appellee did not "attempt[ ] to *delegate* its power of eminent domain to a private party in an agreement whereby *the developer controls what property is taken* ...." (Emphases added.) Therefore, those findings are linked to illegal delegation and not to pretext. Although it may turn out to be true that "[Appellants] have likewise failed to rebut the presumption in favor of the legislature[,]" dissenting opinion at 398, 198 P.3d at 660, we believe that was a question for the court to determine, and we cannot conclude that the record confirms that it did so.

### F.

Further, the dissent claims that "the majority's conclusion ... appears to rest on the fact that the trial court did not ... use the

specific word 'pretext' or 'pretextual' in its written decision." Dissenting opinion at 402, 198 P.3d at 664. It is true that the court rendered conclusions mentioning pretext with respect to Condemnation 1, but made no reference to *Kelo* or any consideration of pretext with respect to Condemnation 2. But that is not the primary concern here. Rather, the focus of the foregoing discussion is that the court's findings and conclusions with respect to Condemnation 2 do not plainly indicate that the court actually decided the pretext issue and looked beyond the face of Resolution 31–03.

### G.

▮ Also, the dissent asserts that "[t]he majority seems troubled by the fact that Oceanside received a benefit from Condemnation 2[.]" *Id.* at 402, 198 P.3d at 664. The receipt of a private benefit may be a relevant factor in consideration of the pretext defense. However, the ultimate question for the court is whether the "actual purpose was to bestow a private benefit[,]" *Kelo*, 545 U.S. at 478, 125 S.Ct. 2655, or the taking was "clearly and palpably of a private character," *Ajimine*, 39 Haw. at 550. The concern is not with *incidental* private benefits. What is fundamental to judicial review is full consideration of the arguments and evidence presented by the defending landowner in its attempt to make the requisite clear and palpable showing of pretext.

### H.

Finally, the dissent posits that "[t]he majority's remand of this case to the trial court improperly provides the [Appellant] with a second bite at the apple to make a 'clear showing that the taking was intended to favor [Oceanside].'" Dissenting opinion at 404, 198 P.3d at 666 (brackets and citation omitted). To the contrary, in the absence of findings and conclusions demonstrating that the court actually considered and rejected Appellant's pretext argument, remand will not provide a "second bite at the apple," but will ensure compliance with the precepts of *Ajimine* and *Kelo* as laid out in this opinion.

### VII.

Accordingly, we cannot concur with the dissent that, in the context of this case, "'the power of eminent domain is merely a means to an end [and that o]nce the object, *i.e.*, the public purpose, is within the authority of the government, the means by which it will be attained is also for the government to determine.'" Dissenting opinion at 403, 198 P.3d at 665 (quoting *Midkiff*, 467 U.S. at 240, 104 S.Ct. 2321) (ellipses points and brackets omitted). Taken to its logical conclusion, that statement would mean that the government could delegate its eminent domain power to a private party if it so chose, so long as the end that was finally achieved was a "classic public use." Under that formulation, the court's determination in Condemnation 1 would be wrong, because so long as the stated public purpose was a public road, it would be irrelevant that Appellee illegally delegated its eminent domain power to Oceanside. That cannot be what the Supreme Court in *Midkiff* intended, inasmuch as the majority in *Kelo* indicated that there are limits on the eminent domain power. *See* 545 U.S. at 478, 125 S.Ct. 2655.

In sum, existing state and federal case law provide ample authority for our courts to examine allegations that a taking is pretextual. Under the circumstances of this case, it appears that the court erred in declining to expressly examine the pretext issue in Condemnation 2. Therefore, the court's September 27, 2007 Judgment in Condemnation 2 must be vacated and this case remanded.

### VIII.

Based on the foregoing, (1) the court must enter a decision and order on Appellant's motion for statutory damages pursuant to HRS § 101–27 as to Condemnation 1; (2) Condemnation 2 was not abated by Condemnation 1, therefore, the court did not err in proceeding with Condemnation 2; and (3) the court must expressly consider the question of whether Appellee's asserted public purpose underlying Condemnation 2 was pretextual. Consequently, Condemnation 1 is remanded for a decision on Appellant's motion for statutory damages, and the court's September 27, 2007 Judgment in Condemnation 2 is

vacated and the case remanded for an express determination by the court of whether the asserted public purpose was pretextual.

Concurring and dissenting opinion by MOON, C.J., in which LEVINSON, J., joins.

I concur with the majority's opinion, except I respectfully dissent from its decision to remand Condemnation 2 "for an express determination by the [trial] court of whether the asserted public purpose was pretextual." Majority Opinion at 390, 198 P.3d at 653. I believe the Circuit Court of the Third Circuit was correct in concluding that Condemnation 2 had a valid "public purpose"[1] under the Public Use Clauses of the United States and Hawai'i Constitutions. Consequently, I would affirm the trial court's September 27, 2007 amended final judgment on the issue of public purpose.

## I. DISCUSSION

This court has previously indicated that the Public Use Clause of the federal constitution is "substantially similar" to that of the Hawai'i Constitution; thus, the Supreme Court's interpretation of the federal Public Use Clause "is persuasive authority for our review of the Hawai'i constitutional provision." *Hawai'i Hous. Auth. v. Lyman,* 68 Haw. 55, 69, 704 P.2d 888, 896 (1985). Consequently, I begin my discussion with the Supreme Court's interpretation of the federal Public Use Clause.

The United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "This provision applies to the states through the Fourteenth Amendment." *Richardson v. City & County of Honolulu,* 124 F.3d 1150, 1156 (9th Cir.1997) (citation omitted). Moreover, the Supreme Court "has declared that a taking should be upheld as consistent with the Public Use Clause . . . as long as it is rationally related to a conceivable public purpose." *Kelo,* 545 U.S. at 490, 125 S.Ct. 2655 (Kennedy, J., concurring) (internal quotation marks omitted) (citing *Hawai'i Hous. Auth. v. Midkiff,* 467 U.S. 229, 241, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), and *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954)).

In the case at bar, the parties' arguments (and the majority's analysis) with regard to public purpose focus on the Supreme Court's recent decision in *Kelo.* More specifically, the appellants seemingly argue that *Kelo* stands for the proposition that the condemning authority's motives should be scrutinized and that a standard beyond the well-established and longstanding rational-basis test should be applied when reviewing a purported public purpose in the federal eminent domain context. In other words, the appellants are seemingly urging this court to adopt the purported test espoused by Justice Kennedy in his concurrence in *Kelo.* However, inasmuch as Justice Kennedy's concurrence obviously expresses the view of a single justice of the Court, any purported test espoused therein must be grounded in the opinion of the *Kelo* majority [hereinafter, Majority or *Kelo* Majority] upon which it could be said that Justice Kennedy further expounded in his concurrence. Accordingly, a review of the *Kelo* Majority's opinion is necessary to determine whether, in fact, *Kelo* requires scrutiny beyond the established rational-basis test.

### A. The Kelo Majority

As indicated by the majority's opinion in the case at bar [hereinafter, majority or *Coupe* majority], the *Kelo* Majority "summarized the Court's public purpose jurisprudence as 'wisely eschew[ing] rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power.'" *Coupe* Majority Opinion at 377, 198 P.3d at 640 (quoting *Kelo,* 545 U.S. at 483, 125 S.Ct. 2655). In so doing, the *Kelo* Majority stated that "two polar positions

---

1. Many courts differentiate between a "public purpose" analysis and a "public use" analysis. The latter requires that the property taken be usable by the general public, whereas the former requires only that the overall objective of the project comprises a public benefit. *Kelo v. City of New London,* 545 U.S. 469, 479–80, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). At the end of the nineteenth century, the United States Supreme Court rejected the public use test and adopted the public purpose test. *Id.; see also* Majority Opinion at 376, 198 P.3d at 639.

[were] perfectly clear," 545 U.S. at 477, 125 S.Ct. 2655:

> On the one hand, it has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation. On the other hand, it is equally clear that a State may transfer property from one private party to another if future "use by the public" is the purpose of the taking; the condemnation of land for a railroad with common-carrier duties is a familiar example.

*Id.* With regard to the first proposition, the Majority further stated that

> the City would no doubt be forbidden from taking [landowners]' land for the purpose of conferring a private benefit on a particular private party. *See Midkiff,* 467 U.S. at 245, 104 S.Ct. 2321 ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void"). Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit.

*Id.* at 477–78, 125 S.Ct. 2655 (some citations and footnote omitted). In examining whether the taking at issue in *Kelo* bestowed a purely private benefit, the Majority reasoned that "[t]he takings before us ... would be executed pursuant to a 'carefully considered' development plan ... [and] there was no evidence of an illegitimate purpose[.]" *Id.* at 478, 125 S.Ct. 2655 (citation omitted). Therefore, the Majority determined that "the City's development plan was not adopted to benefit a particular class of identifiable individuals," *i.e.,* there was no pretext of public purpose. *Id.* (internal quotation marks omitted).

The *Kelo* Majority recognized that, "[w]ithout exception, our cases have defined th[e] concept [of public purpose] broadly, reflecting our longstanding policy of deference to legislative judgments in this field." *Id.* at 480, 125 S.Ct. 2655. Thus, the *Kelo* Majority looked to the City's "carefully formulated" development plan to determine whether it served a public purpose. *Id.* at 483, 125 S.Ct. 2655. Recognizing "the comprehensive character of the plan, the thorough deliberation that preceded its adoption, and the limited scope of [the Court's] review[,]" *id.* at 484, 125 S.Ct. 2655, the Majority determined it was appropriate "to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan." *Id.* "Because that plan unquestionably serve[d] a public purpose," *id.,* the *Kelo* Majority "[d]eclin[ed] to second-guess the City's considered judgments about the efficacy of its development plan," *id.* at 488, 125 S.Ct. 2655, and held that the challenged takings "satisf[ied] the public use requirement of the Fifth Amendment." *Id.* at 484, 125 S.Ct. 2655.

The *Kelo* majority, in my view, affirmed *Midkiff* and *Berman,* which cases applied a rational-basis test in their respective public purpose analyses. 545 U.S. at 481–82, 488, 125 S.Ct. 2655. Thus, I believe that the rational-basis test—which includes deference to the government's statement of public purpose—remains the appropriate test for determining the constitutionality of a "public use" under the federal constitution.

Nevertheless, the appellants rely heavily on Justice Kennedy's concurrence for the proposition that "[a] court applying rational-basis review under the Public Use Clause should strike down a taking that, *by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits*[.]" *Kelo,* 545 U.S. at 491, 125 S.Ct. 2655 (Kennedy, J., concurring) (emphasis added) (original brackets omitted); *see Coupe* Majority Opinion at 378, 198 P.3d at 641. In other words, the appellants urge this court to follow Justice Kennedy's willingness to investigate the veracity of an asserted public purpose where such argument is raised. I believe the appellants' reading of Justice Kennedy's concurrence is overly broad and requires closer examination.

## B. *Justice Kennedy's Concurrence*

Justice Kennedy begins his concurrence by stating, "I join the opinion for the Court and add these *further observations*." *Kelo,* 545 U.S. at 490, 125 S.Ct. 2655 (emphasis added)

(Kennedy, J., concurring). He acknowledges that the Supreme Court

> has declared that a taking should be upheld as consistent with the Public Use Clause ... *as long as it is "rationally related to a conceivable public purpose."* This deferential standard of review echoes the rational-basis test used to review economic regulation under the Due Process and Equal Protection Clauses.

*Id.* (emphasis added) (quoting *Midkiff,* 467 U.S. at 241, 104 S.Ct. 2321) (citing *Berman, supra*) (other citations omitted). He then observes:

> The determination that a rational-basis standard of review is appropriate does not, however, alter the fact that transfers intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are forbidden by the Public Use Clause.
>
> A court *applying rational-basis review* under the Public Use Clause should strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits, *just as* a court *applying rational-basis review* under the Equal Protection clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications.

*Id.* at 490–91, 125 S.Ct. 2655 (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 446–47, 450, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Dep't of Agric. v. Moreno,* 413 U.S. 528, 533–36, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (emphases added)). Justice Kennedy's citations to *Cleburne* and *Moreno* are particularly instructive. In *Cleburne,* the Court, applying a rational-basis analysis, held unconstitutional a zoning ordinance that required a special use permit for homes for the mentally retarded inasmuch as the ordinance "appear[ed] to [the Court] to rest on an irrational prejudice against the mentally retarded." 473 U.S. at 447, 450, 105 S.Ct. 3249. Likewise, the Court, in *Moreno,* applied a rational-basis analysis in reviewing the "unrelated person provision" of a food stamp statute. 413 U.S. at 537, 93 S.Ct. 2821. The subject provision excluded from participation in the food stamp program any household in which an individual, living in the household, was unrelated to other household members. *Id.* at 529, 93 S.Ct. 2821. The Court struck down the provision inasmuch as it created an "irrational classification," *i.e.,* it did not "rationally further some legitimate governmental interest." 413 U.S. at 532–33, 534, 93 S.Ct. 2821. In my view, Justice Kennedy's references to *Cleburne* and *Moreno,* coupled with his additional observations quoted *infra* note 2, (1) confirms his adherence to the applicability of the rational-basis test and (2) demonstrates that, although rational basis analysis requires great deference to the legislature, such deference is not absolute.[2]

The position espoused by Justice Kennedy in his concurrence is, in my view, substantially similar to that of the *Kelo* Majority, *i.e.,*

---

**2.** Justice Kennedy further observed:

> A court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and *review the record* to see if it has merit, *though with the presumption that the government's actions were reasonable and intended to serve a public purpose.* ...
>
> ....
>
> My agreement with the Court that a presumption of invalidity is not warranted for economic development takings in general, or for the particular takings at issue in this case, does not foreclose *the possibility* that a more stringent standard of review than that announced in *Berman* and *Midkiff might* be appropriate for a more narrowly drawn category of takings. There may be private transfers in which the risk of undetected impermissible favoritism of private parties is so acute that a presumption (rebuttable or otherwise) of invalidity is warranted under the Public Use Clause. *Cf. Eastern Enterprises v. Apfel,* 524 U.S. 498, 549–550[, 118 S.Ct. 2131, 141 L.Ed.2d 451] (1998) (Kennedy, J., concurring in judgment and dissenting in part) (heightened scrutiny for retroactive legislation under the Due Process Clause). This demanding level of scrutiny, however, is not required simply because the purpose of the taking is economic development.
>
> *This is not the occasion for conjecture as to what sort of cases might justify a more demanding standard,* but it is appropriate to underscore aspects of the instant case that convince me **no departure from *Berman* and *Midkiff* is appropriate here.**

*Id.* at 491–93, 125 S.Ct. 2655 (emphases added).

the rational-basis test applies when analyzing a constitutional challenge to a proposed taking under the Public Use Clause. More importantly, notwithstanding the observations made by Justice Kennedy, the Majority did not, in its opinion, see fit to explore "the possibility that a more stringent standard of review than that announced in *Berman* and *Midkiff* might be appropriate[.]" *Id.* at 493, 125 S.Ct. 2655. In fact, neither did Kennedy, who specifically stated that "[t]his is not the occasion for conjecture as to what sort of cases might justify a more demanding standard," *id.*, concluding that "no departure from *Berman* and *Midkiff* is appropriate here." *Id.; see also supra* note 2. Therefore, inasmuch as Justice Kennedy's concurrence—like the *Kelo* Majority—applied a rational-basis analysis to the facts of that case, I concur with the *Coupe* majority's decision in (1) rejecting the appellants' contention that the trial court "should have followed the roadmap to analyzing claims of pretext laid out by Justice Kennedy" and (2) "declin[ing] to adopt Justice Kennedy's concurring opinion" in *Kelo. Coupe* Majority Opinion at 378, 198 P.3d at 641.

In sum, under the federal constitution, the government's use of its eminent domain power will be upheld if it is "rationally related to a conceivable public purpose." *Midkiff,* 467 U.S. at 241, 104 S.Ct. 2321; *see also Kelo,* 545 U.S. at 488, 125 S.Ct. 2655 ("When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings ... are not to be carried out in the federal courts."). In analyzing whether the taking is for a valid public purpose, courts give great deference to the government's determination of public purpose. *Kelo,* 545 U.S. at 480, 125 S.Ct. 2655. However, such deference is not absolute, and, as observed by Justice Kennedy, deference to the government's public purpose determination may be overcome only if the party challenging the taking makes a "clear showing" that the government's stated public purpose is "irrational," *Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249, with "only incidental or pretexutal public benefits." *Kelo,* 545 U.S. at 491, 125 S.Ct. 2655 (Kennedy, J., concurring). Under a rational basis analysis, this is a heavy burden. *See Richardson,* 124 F.3d at 1162 (recognizing that, in the analogous due process context, "[t]he challengers' burden to show that a statute is arbitrary and irrational is extremely high").

## C. *Hawaii's Public Use Clause*

Similar to the federal constitution, the Hawaiʻi Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." Haw. Const. art. I, § 20. In examining whether a particular taking by the state or county government is for a "public purpose," this court has long adhered to a rational-basis standard, *i.e.,* "so long as the exercise of the eminent domain power is rationally related to the objective sought, the legislative public use declaration should be upheld unless it is palpably without reasonable foundation." *Kau v. City & County of Honolulu,* 104 Hawaiʻi 468, 478, 92 P.3d 477, 487 (2004) (citing *Hous. Fin. and Dev. Corp. [ (HFDC) ] v. Castle,* 79 Hawaiʻi 64, 85, 898 P.2d 576, 597 (1995)) (original emphasis omitted). In other words, "[t]he crucial inquiry is whether the legislature might reasonably have believed that application of the sovereign's condemnation powers would accomplish the public use goal." *Id.* (citations, original emphasis, and ellipsis omitted).

In *Hawaiʻi Housing Authority v. Ajimine,* 39 Haw. 543 (Haw.Terr.1952) (an early case addressing the public use clause), this court stated the "general rule" that:

> Primarily, *the right to declare what shall be deemed a public use is vested in the legislature;* and[,] consequently, when the public nature of a use for which a taking has been authorized by law is disputed, *the question as it presents itself to the courts is whether the legislature might reasonably have considered the use public, not whether the use is public.* **This rule rests on the presumption that a use is public if the legislature has declared it to be such.** *The strength of that presumption is gauged by the high regard which the courts have for a declaration of public use by the legislature as a decision of a coordinate department of the government on a matter within its knowledge and duty.*

Illustrative of such regard, all the authorities agree that *legislative findings and declarations of public use are entitled to great weight.* Moreover, a legislative finding and declaration that the particular uses, as here involved, are public is *entitled not only to respect but to a prima facie acceptance of its correctness.* Indeed, where [as here] the Legislature declares a particular use to be a public use[,] the presumption is in favor of this declaration, and *will be binding upon the courts* **unless such use is clearly and palpably of a private character. But that does not mean that either the decision of the legislature or the presumption is conclusive,** *for the issue of public use is a judicial question and one of law to be decided on the facts and circumstances of each particular case. Nevertheless, the great weight accorded to the legislative finding and the prima facie acceptance of its correctness, as well as the binding effect of the presumption, demonstrates that* **the courts will not lightly disturb such a finding and will not overrule it unless it is manifestly wrong.**

*Id.* at 549–50 (emphases added) (some brackets added and some in original) (citations and internal quotation marks omitted).

The above declaration in *Ajimine*, as well as subsequent cases, echo the views espoused in *Kelo*, discussed *supra*, including Justice Kennedy's concurrence. For example, in *Hawai'i Housing Authority v. Lyman*, 68 Haw. 55, 704 P.2d 888 (1985), this court explicitly adopted the "minimum rationality standard" as the appropriate test "for judicial evaluation of the legislature's public use determinations." 68 Haw. at 69, 704 P.2d at 896–97. The *Lyman* court specifically held that,

once the legislature has spoken on the social issue involved, *so long as the exercise of eminent domain power is rationally related to the objective sought, the legislative's public use declaration should be upheld unless it is palpably without reasonable foundation.* The crucial inquiry is whether the legislature might reasonably consider the use public, and whether it rationally could have believed that applica-

tion of the sovereign's condemnation powers would accomplish the public use goal. *Id.* at 70–71, 704 P.2d at 897 (emphasis added) (internal citations omitted). Likewise, in *HFDC*, this court observed that the appropriate test for determining "public use" in an eminent domain action under both the Hawai'i and United States Constitutions "is substantially the same as the least demanding level of equal protection analysis—'rational basis,'" 79 Hawai'i at 86, 898 P.2d at 598:

Under the rational basis test, the court essentially asks whether a statute rationally furthers a legitimate state interest. In making this inquiry, a court will not look for empirical data in support of the statute. It will only seek to determine whether any reasonable justification can be conceived to uphold the legislative enactment.

Once it is determined that the legislature passed the statute at issue to further a legitimate government purpose, then the pertinent inquiry is only whether the [l]egislature rationally could have believed that the [statute] would promote its objective. Additionally, the lawmakers are under no obligation to convince the courts of the correctness of their legislative judgments. Rather, **those challenging the legislative judgment must convince the court that the legislative facts on which the [statute] is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.**

*Id.* (underscored emphases and brackets in original) (bold emphasis added) (citations omitted) (format altered). *See also Richardson*, 124 F.3d at 1156 (applying a rational-basis test to a public purpose analysis under both the Hawai'i and United States Constitutions).

Consequently, our own case law demonstrates that the rational-basis test—identical to that laid out in the federal precedent—is the appropriate standard to be applied in this jurisdiction when determining whether a governmental taking has a public purpose under the public use clause of the Hawai'i Constitution, as well as the federal constitution. Under such standard, the government's determination that a particular taking is for a public purpose will be upheld if it "rationally

furthers a legitimate state interest." *HFDC,* 79 Hawai'i at 86, 898 P.2d at 598. In other words, the legislature's "public use declaration should be upheld unless it is palpably without reasonable foundation." *Lyman,* 68 Haw. at 70, 704 P.2d at 897. However, as previously indicated, the great deference given to the government's determination of public purpose is not absolute, and the burden is on the party "challenging the legislative judgment [to] convince the court that the legislative facts on which the [legislation] is apparently based *could not reasonably be conceived to be true* by the governmental decisionmaker." *HFDC,* 79 Hawai'i at 86, 898 P.2d at 598 (emphasis in original).

D. *Application of the Rational–Basis Test*

Under a rational basis analysis, this court "essentially asks whether [the legislation] rationally furthers a legitimate [government] interest." *Id.* at 86, 898 P.2d at 598. In the context of the facts of Condemnation 2, I first address whether Condemnation 2 furthers a legitimate government interest, *i.e.,* whether the challenged taking is for a public purpose.

### 1. Public Purpose

As previously discussed, this court will "defer to the [County's] determination regarding public use unless the use involves an 'impossibility' or is 'palpably without reasonable foundation.'" *Richardson,* 124 F.3d at 1158 (citing *Midkiff,* 467 U.S. at 240–41, 104 S.Ct. 2321); *see also, Kelo,* 545 U.S. at 483, 125 S.Ct. 2655 (deferring to the government's determination of public purpose). Moreover, "[i]n making this inquiry, a court will not look for empirical data in support of the [legislation]. It will only seek to determine whether any reasonable justification can be conceived to uphold the [County's] enactment." *HFDC,* 79 Hawai'i at 86, 898 P.2d at 598 (original emphasis omitted).

Here, Resolution No. 31–03, which served as the basis for Condemnation 2, recognized that: (1) a bypass road was being planned and developed; (2) the current highway was determined to be inadequate to handle the volume of traffic; and (3) the County determined that the bypass road provided a re-

gional benefit and was necessary for a public purpose and use. Specifically, Resolution 31–03 provided in relevant part that:

> Whereas, a *bypass highway has been planned and is being developed to run makai of Māmalahoa Highway* from the area of Keauhou to its terminus with the Māmalahoa Highway in the vicinity of Napo'opo'o Road; and
>
> Whereas, the **Kona Regional Plan** identified *the current Māmalahoa Highway as inadequate to handle the volume of traffic currently traversing on the roadway;* and
>
> Whereas, *the proposed Māmalahoa Bypass Highway has been determined by the County of Hawai'i, through its County Council, as providing a regional benefit for a public purpose and use which will benefit the County of Hawai'i*[.]
>
> . . . .
>
> Now, therefore, be it resolved by the Council of the County of Hawai'i that it is necessary for *the public use and purpose,* to wit: *the construction and development of a road intended to bypass the Māmalahoa Highway in the approximate vicinity between Keauhou and Captain Cook, Kona,* to acquire and condemn a portion of that certain private property . . . .

(Emphases added.) The Kona Regional Plan was adopted by the County Council in *1982* and was introduced into evidence (as Exhibit D–14) by the County as support of its public purpose argument.

It is well-settled that, "whenever property is taken for a highway, it is for the public use, *notwithstanding that the highway may greatly benefit a private party.*" *Rodgers Dev. Co. v. Town of Tilton,* 147 N.H. 57, 781 A.2d 1029, 1034 (2001) (emphasis added) (citations omitted); *see also City of Novi v. Robert Adell Children's Funded Trust,* 473 Mich. 242, 701 N.W.2d 144, 151 (2005) (holding that a proposed road, built partly in response to traffic problems, was for a public purpose even though a private entity would be the primary user of the road and had contributed funds to the project); *Garvie v. City of Ft. Walton Beach,* 366 F.3d 1186, 1189–90 (11th Cir.2004) (holding that paving

a right of way across a portion of landowners' property, which facilitated transportation and made it easier for people and emergency vehicles to get to various places, constituted legitimate public purposes); and *Coupe* Majority Opinion at 380–81, 198 P.3d at 643–44 n. 32 (collecting cases for the above proposition); *but cf. Bd. of County Comm'rs of County of Morgan v. Kobobel*, 176 P.3d 860, 865 (Colo.Ct.App.2007) (holding that county had no valid public purpose for its condemnation of property owners' land for use as a public road to a private cemetery because there was little public demand and no particular need for the county road).

Resolution No. 31–03 plainly states that the public purpose is "the construction and development of a road intended to bypass the Māmalahoa Highway" inasmuch as "the current Māmalahoa Highway [is] inadequate to handle the volume of traffic currently traversing on the roadway[.]" Clearly, the County's determination that the condemnation is necessary for a public purpose does not, *on its face*, involve an "impossibility" and is not "palpably without reasonable foundation." *Richardson*, 124 F.3d at 1158. In other words, without "look[ing] for empirical data in support of the [resolution]," *HFDC*, 79 Hawai'i at 86, 898 P.2d at 598 (original emphasis omitted), the County's stated public purpose determination was, indeed, reasonable. Moreover, the County's public purpose determination was based upon the Kona Regional Plan, and the appellants do not argue or otherwise challenge the plan as not "comprehensive" or "carefully formulated." *Kelo*, 545 U.S. at 483, 125 S.Ct. 2655. Contrary to the majority's position, I believe that it was not necessary for the trial court to look beyond the face of Resolution 31–03 because the construction of a bypass road that would, unquestionably, benefit the public is a valid public purpose to which Condemnation 2 is rationally related. Consequently, inasmuch as this court's inquiry under a rational basis test "seeks only to determine whether any reasonable justification can be found for the legislative enactment," *State v. Mallan*, 86 Hawai'i 440, 446, 950 P.2d 178, 184 (1998), and the construction of a bypass road is a reasonable justification for the use of eminent domain, I would hold that the trial court correctly concluded that "County Resolution 31–03 is valid." [3]

The majority concludes that the trial court was required to examine the appellants' pretext defense because "both *Ajimine* and *Kelo* make it apparent that, although the government's stated public purpose is subject to prima facie acceptance, it need not be taken at face value *where there is **evidence** that the stated purpose might be pretextual*." *Coupe* Majority Opinion at 381, 198 P.3d at 644 (emphases added) (citation omitted). Indeed, the majority states that *Ajimine* "indicates that a burden-shifting regime is appropriate by referring to a 'presumption' in favor of the legislature, whose determination is subject to 'prima facie acceptance,' which is 'binding' unless that presumption is rebutted by evidence that 'such use is clearly and palpably of a private character.'" *Id.* at 381, 198 P.3d at 644 n. 33 (citation omitted). Notwithstanding the month-long trial and the voluminous transcripts of testimony and exhibits presented, the appellants nevertheless rely on the naked assertion that "Condemnation 2

---

3. Specifically, the trial court concluded with regard to the public purpose of Condemnation 2:
 97. The inquiry under the public use clause of Article 1, Section 20 is whether a taking is designed to further a "legitimate government purpose." *Housing Finance & Dev. Corp. v. Castle*, 76[79] Haw. 64[, 898 P.2d 576] (1992).
 98. Generally, courts are bound by the legislature's public use determination unless the use is clearly and palpably of a private character. *State v. Anderson*, 56 Haw. 566[, 545 P.2d 1175] (1976). However, the public use question is still one that remains judicial in nature. *Haw. Hous. Auth. v. Ajimine*, 39 Hawai'i 543[, 1952 WL 7381] (1952).
 99. *The County Council determined that there was a public purpose in County Resolution 31–03.* County Resolution 31–03 did not refer to the Development Agreement, and was passed by a new County Council with a different Council make-up.
 . . . .
 101. *County Resolution 31–03 is valid.*
 102. The [trial c]ourt concludes that the *eminent domain action in [Condemnation 2] is validly supported by public purpose* and properly passed by the [Hawai'i County Council].
 (Emphases added.)

provided a 'predominately private benefit to Oceanside,'" *id.* at 381, 198 P.3d at 644 (ellipsis omitted), which is clearly not evidence. Inasmuch as the majority and the appellants have failed to point to any evidence that the public purpose of Condemnation 2 (construction of a bypass road) might have been pretextual and that the actual purpose of Condemnation 2 was to bestow a private benefit on Oceanside, they have likewise failed to rebut the presumption in favor of the legislature. Consequently, the "burden-shifting regime" is inappropriate.

To be clear, I agree with the majority (and Justice Kennedy's concurrence in *Kelo* ) that, in certain circumstances, it might be appropriate and, perhaps, even necessary for the trial court to closely examine the government's asserted public purpose. But, where the government's stated public purpose is to build a public highway, such purpose is not one of those "certain circumstances" that warrants closer scrutiny. Here, the public purpose of Condemnation 2 is the construction of a much-needed bypass, and such purpose, as previously discussed, "*is* for the public use, notwithstanding that the highway may greatly benefit a private party." *Rodgers Dev. Co.*, 781 A.2d at 1034 (emphasis added). Thus, the majority's reliance on a string of federal cases [4]—all relating to economic development condemnations (involving takings for, *inter alia,* private developments, a Target store, and Costco stores)—is unpersuasive. Indeed, *Kelo* also involved an economic development condemnation, and the *Kelo* majority and Justice Kennedy opined that there may be circumstances where a more stringent level of scrutiny would be required, however, stopped short of suggesting what

those circumstances might be. Because they were unwilling to examine the appellants' pretext defense in the face of a taking premised on an economic development plan, it would seem illogical to expect them to be willing to examine the appellants' pretext defense in this case, where the taking is based on a classic public purpose. In sum, although I agree with the majority that *Kelo* does not "'foreclose' the possibility of successful pretext defenses," *Coupe* Majority Opinion at 379, 198 P.3d at 642 n. 31, I do not believe that this case presents a situation where it is necessary to closely scrutinize the motives of the City Council in Condemnation 2 inasmuch as the stated public purpose of the taking—a public bypass road—will undoubtably benefit the public and the taking is rationally related to that public use.

In justifying its consideration of the appellants' pretext argument, the *Coupe* majority states that "the [trial] court's conclusion that Condemnation 2's public purpose was valid[ ] because the Resolution upon which it was based omitted reference to the [d]evelopment [a]greement and was passed by a slightly altered [Hawai'i County Council] may have elevated form over substance[,]" *Coupe* Majority Opinion at 383, 198 P.3d at 646 (citation omitted), and that the trial court "did not expressly consider the question of whether the taking 'clearly and palpably of a private character.'" *Id.* at 383–84, 198 P.3d at 646–47 (citation omitted). More specifically, the majority states:

> [I]t is not discernible that the [trial] court based its determination of public purpose on anything more than the fact that "County Resolution No. 31–03 states that the proposed construction and use of the

---

**4.** *See Franco v. Nat'l Capital Revitalization Corp.,* 930 A.2d 160, 169 (D.C.2007) (holding that condemnee adequately pled that declared public purpose for condemning land, *i.e.,* redevelopment to remove blight, was mere pretext for bestowing private benefit); *Goldstein v. Pataki,* 516 F.3d 50, 59–60 (2d Cir.2008) [hereinafter, *Goldstein II*] (holding that redevelopment of blighted area, creation of affordable housing, creation of public open space, and various mass-transit improvements was rationally related to public use); *Aaron v. Target Corp.,* 269 F.Supp.2d 1162, 1177 (E.D.Mo.2003), *rev'd on other grounds,* 357 F.3d 768, 777 (8th Cir.2004) (granting a temporary restraining order where proper-

ty owners had shown that city may have improperly condemned property so as to turn it over to a private discount retail corporation for use as a Target store); *Cottonwood Christian Ctr. v. Cypress Redev. Agency,* 218 F.Supp.2d 1203, 1229–30 (C.D.Cal.2002) (holding that property owner had demonstrated at least a fair question on the merits of its takings claim on public use grounds where property was to be taken for use as a Costco store); and *99 Cents Only Stores v. Lancaster Redev. Agency,* 237 F.Supp.2d 1123, 1130 (C.D.Cal.2001) (holding, *inter alia,* that prevention of future blight was not a legitimate public use).

[Bypass] would provide a public benefit to the County of Hawaii" and that "the [Hawai'i County Council] determined that there was a public purpose in County Resolution [No.] 31–03." The [trial] court did not state that [a]ppellant failed to make a clear showing that the use was of a predominantly private character, or indicate any recognition that despite any ostensible private benefit to Oceanside, the actual purpose was a valid public use.

*Id.* at 384, 198 P.3d at 647 (emphases omitted) (some brackets in original and some added). Based on the foregoing, the majority orders that the case be "remanded for an express determination by the [trial] court of whether the asserted public purpose was pretextual." *Id.* at 389–90, 198 P.3d at 652–53. I cannot agree with the majority, but assuming *arguendo* that the appellants' contention squarely raises the issue whether Condemnation 2 "is clearly and palpably of a private character," *Ajimine,* 39 Haw. at 550, the *record* indicates—contrary to the majority's assertion—that the trial court *did,* in fact, seriously consider whether the County's stated public purpose to build a bypass road to alleviate traffic concerns was a mere pretext for the actual purpose to bestow a private benefit. The majority concludes that "it is unclear from the entirety of the [trial] court's *findings and conclusions* regarding Condemnation 2 whether the court did in fact consider and reject [a]ppellant's pretext argument." *Coupe* Majority Opinion at 382, 198 P.3d at 645 (emphasis added). Such statement seems to indicate that the majority's position is based solely on the trial court's findings and conclusions. However, it is axiomatic that, on appeal, this court should not limit itself to the four corners of the trial court's FOFs and COLs, but also look to the record. *See, e.g., State v. Magoon,* 75 Haw. 164, 180, 858 P.2d 712, 722 (1993) (stating that a review of the entire record on appeal from land court decision was appropriate because "[t]o determine otherwise would unduly restrict the appellate court's authority of review to the four corners of the decree and thus lead to absurd and unjust results"). In so doing, the record in this case demonstrates, as discussed *infra,* that the pretext defense was considered and rejected by the trial court,

notwithstanding the fact that the trial court did not specifically use the words "pretext" or "pretextual" in its FOF's and COLs.

As previously discussed, the *Kelo* Majority recognized that a taking would not be allowed *"under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." Kelo,* 545 U.S. at 478, 125 S.Ct. 2655 (emphasis added). Although the *Kelo* Court did not define or provide any guidance as to what constitutes "mere pretext," the United States District Court for the Eastern District of New York—based on its reading of *Berman, Midkiff,* and *Kelo*—"define[d] the boundaries of the public use requirement" as follows:

> [A] taking fails the public use requirement *if and only if* the uses offered to justify it are "palpably without reasonable foundation," *Midkiff,* [467 U.S.] at 241[, 104 S.Ct. 2321], such as if (1) the *"sole purpose" of the taking is to transfer property to a private party, Kelo,* [545 U.S.] at 477[, 125 S.Ct. 2655]; *Midkiff,* [467 U.S.] at 245[, 104 S.Ct. 2321], or (2) *the asserted purpose of the taking is a "mere pretext" for an actual purpose to bestow a private benefit, Kelo,* [545 U.S.] at 478[, 125 S.Ct. 2655].

*Goldstein v. Pataki,* 488 F.Supp.2d 254, 278, 286 (E.D.N.Y.2007) [hereinafter, *Goldstein I], judgment affirmed by,* 516 F.3d 50 (2d Cir.), *cert. denied,* —— U.S. ——, 128 S.Ct. 2964, 171 L.Ed.2d 906 (2008) (emphases added). The *Goldstein I* court held that the plaintiffs therein did not "allege facts sufficient to render plausible their claim that the [taking] serves no public use at all" inasmuch as:

> Nowhere in the [a]mended [c]omplaint or their briefs d[id] the p]laintiffs sufficiently allege any purpose to confer a private benefit. In other words, [the p]laintiffs attempt to satisfy the "mere pretext" test solely by alleging that the purported purposes of the [taking] are dubious, but *Kelo* requires them to allege that the "actual purpose" of the Project is "to bestow a private benefit" on [the defendant]. [545 U.S.] at 478[, 125 S.Ct. 2655],.... In fact, *Justice Kennedy, analogizing to Equal Protection jurisprudence, would require "a clear showing [that a taking] is intend-*

*ed to favor a particular private party" before the taking is ruled unconstitutional. Id.* at 491[, 125 S.Ct. 2655.]

488 F.Supp.2d at 287–88 (emphasis added).

In the instant case, none of the parties assert that "the 'sole purpose' of the taking [was] to transfer property to a private party"; thus, the relevant inquiry is whether "the asserted purpose of the taking[, *i.e.,* to build a bypass road,] is a 'mere pretext' for an actual purpose to bestow a private benefit." 488 F.Supp.2d at 286 (citations omitted). As previously stated, there is no question that the bypass road in this case would serve a public purpose. Thus, the ultimate question before this court—as it was before the trial court—is whether the County's decision to condemn the subject property for the construction of a public bypass road was a mere pretext for its actual purpose to bestow a private benefit on Oceanside.

Here, a jury-waived trial on Condemnation 1 and Condemnation 2 was conducted from July 9, 2007 to August 2, 2007. Over the course of the month-long trial, the parties presented extensive evidence and arguments regarding, *inter alia,* the "actual purpose" of the taking. Specifically, the appellees argued that there was a long-standing need for a bypass road to serve the community, which was a valid public purpose, and that the construction of the bypass road was the "actual purpose" of Condemnation 2 (as well as the relevant portion of the development agreement). Additionally, during closing arguments, the appellees emphasized that "[t]here [was] clear evidence ... [o]f public purpose, but there [was] no clear evidence of pretext." Conversely, the appellants argued that the asserted public purpose in building the bypass road was "a sham and [was] hiding what [was] really going on." In essence, the appellants contended that the actual purpose of Condemnation 2 was to bestow a private benefit on Oceanside and that the County was taking the subject property "not to save the road," but to comply with its "obligation under the development agreement." In support of their actual purpose contention, the appellants proffered evidence that Oceanside (1) had the sole discretion to determine the roadway and (2) changed the

bypass's northern terminus from mauka at Kuakini Highway to makai at Ali'i Highway to benefit Oceanside. Moreover, the appellants argued, in closing, that the evidence submitted at trial suggested that the County's studies indicating the need for the road, as well as the decision to choose the Ali'i terminus over the Kuakini terminus, were flawed.

The trial court ultimately entered the following relevant unchallenged findings of fact (FOFs), relating to both Condemnation 1 and Condemnation 2:

**County's Need**

6. ***By 1979,*** *the County recognized a need for a road to bypass the Māmalahoa Highway due to the projected inadequacies of existing highway, high accident rates, higher anticipated traffic volume and congestion,* and the need for a route continuously around the island in a 1979 study conducted by the Hawai'i Department of Transportation entitled *Hawaii Belt Road Holualoa to Papa Preliminary Engineering Report.*

7. In 1982, the Kona Regional Plan had identified traffic problems along the Māmalahoa Highway, and determined that the traffic was equal to or exceeded the roadway design capacity. The County also found that the rapid increase in traffic placed a heavy burden on the roadway network, and increased both travel time and inconvenience.

8. In response, the County adopted the proposed 1979 State Bypass Highway and Alii Drive Extension on the 1989 County General Plan Public Facilities Map.

9. The County further conducted the following studies:

 a. The 1989 Hawai'i County Council General Plan adopted the 1979 State Bypass Highway and the Alii Highway

 b. The 1993 study by Parson, Brickerhoff, Quake and Douglas found that a bypass highway would be sufficient to relieve all existing and projected future regional congestion on Māmalahoa Highway.

c. A 1998 study prepared for the Hawaii Department of Transportation, entitled *Hawaii's Long Range Land Transportation Plan Final Report*, recognized the need for the Māmalahoa Bypass Highway based on traffic safety considerations.

d. A 1998 study prepared for the State of Hawaii Department of Transportation recognized the need, based on traffic safely considerations, for the Māmalahoa Bypass Highway.

. . . .

**Oceanside's Proposal**

13. *Recognizing the County's need for new roads*, Oceanside proposed to build the bypass highway in exchange for a change of zoning for the Hokulia development project. County Ordinance Number 94–73 accepted Oceanside's proposal, and change the zoning for the Hokulia project while requiring Oceanside to acquire and build the bypass highway at its own expense.

(Some emphases in original and some added.) (Citations to exhibit numbers and testimony omitted.) Additionally, with regard to the public purpose of Condemnation 2, the trial court made the following relevant unchallenged FOFs:

100. The [bypass road] was to be built to [s]tate [h]ighway [d]esign standards.

101. The *alignment of the [bypass highway], with a northern terminus at Alii*

*Highway was preferred and selected by the County of Hawai'i's Department of Public Works, and is consistent with the General Plans that have been adopted by the County.*

102. In County Resolution No. 31–03, *the final determination of the [bypass road] remained with the County of Hawai'i Department of Public Works.*

(Emphases added.) (Citations to exhibit numbers and testimony omitted.) In essence, the trial court found that the County had—*since 1979*—"recognized a need for a road to bypass Māmalahoa Highway." Additionally, the trial court found that, *based upon Oceanside's awareness of the public need for a bypass road,* it proposed to build the road in exchange for a change in zoning.

With regard to Condemnation 1, the trial court also determined that Condemnation 1 had "County Resolution [No.] 266–00 as its basis for public purpose,"[5] and that "County Resolution [No.] 266–00 states that it is necessary for public use and purpose to construct the Māmalahoa Bypass Highway *pursuant to the [d]evelopment [a]greement.*" "Public purpose, if any, would be within that [d]evelopment [a]greement." (Emphasis added.) Based on such findings, the trial court concluded, *inter alia,* that "the language within the [d]evelopment [a]greement [made] it unmistakably clear that the County improperly delegated condemnation authority to Oceanside." Inasmuch as the trial court determined that Condemnation 1 ille-

---

5. Condemnation 1 refers to Civil No. 00–1–181K and is based upon Resolution No. 266–00, adopted on July 26, 2000, which provided in relevant part:

Whereas, Oceanside plans to develop the above-mentioned properties into an agricultural lot community and its components, including a lodge, golf course, golf club house and coastline park; and

Whereas, pursuant to Resolution No. 244–95 dated April 1, 1998, Oceanside and the [County] entered into a development agreement, the terms and conditions of which will require Oceanside to provide certain public and other improvements, including the design, construction[,] and development of a road intended to bypass Māmalahoa Highway in the approximate vicinity between Keauhou and Captain Cook, Kona; said road being planned to con-

sist of two lanes and a sufficient right-of-way for expansion to four lanes; and

Whereas, the bypass highway has been determined by the [County] as providing a regional public purpose which will benefit the County of Hawai'i; and

Whereas, the [D]evelopment [A]greement provides that if on of the owners across whose property the [Bypass] is planned to traverse fails to mutually agree with Oceanside with respect to the purchase price or "terms of the purchase," the condemnation powers of [the County] shall be used to acquire that particular segment with Oceanside reimbursing [the County] for any costs to acquire.

As discussed in the majority's opinion, *Coupe* Majority's Opinion at 383, 198 P.3d at 646 n. 35, the trial court concluded that Condemnation 1 was "invalid because it improperly delegate[d] condemnation authority to a private party.'"

gally delegated condemnation authority to Oceanside, it never reached the issue in Condemnation 1 whether the construction of the bypass road was a valid public purpose nor whether it was a mere pretext for the actual purpose to bestow a private benefit on Oceanside.

However, with regard to Condemnation 2, the trial court determined that the public purpose was "that the proposed construction [of the bypass road] would provide public benefit to the County of Hawai'i." Additionally, the trial court concluded that Condemnation 2, which did not refer to the development agreement, "[stood] independently from the [d]evelopment [a]greement, and that there [was] sufficient attenuation between the [d]evelopment [a]greement previously mentioned and [Resolution No. 31–03]." Inasmuch as Condemnation 2 stood independently from the development agreement, the trial court declared that "[t]he County Council determined that there was a public purpose in County Resolution 31–03," and, thus, Condemnation 2 was "valid." Accordingly, the trial court concluded that Condemnation 2 was "validly supported by public purpose[.]" In so concluding, the trial court rejected the appellants' actual purpose contention, i.e., that Oceanside's sole discretion in changing the bypass' northern terminus from Kuakini to Ali'i indicated that the actual purpose of Condemnation 2 was to bestow a private benefit on Oceanside. Such rejection is explicitly demonstrated in the trial court's findings that (1) "[t]he alignment of the [bypass highway], with a northern terminus at Ali'i Highway[,] was preferred and selected by the County" and (2) "the final determination of the [bypass road] remained with the

County." In other words, contrary to the majority's opinion, the trial court *considered and rejected* the private benefit evidence proffered by the appellants, and, therefore, determined the stated public purpose was *not* pretextual.

Thus, the FOFs and COLs demonstrate—contrary to the majority's assertion—that the trial court did, in fact, examine whether Condemnation 2 was "clearly and palpably of a private character," *Ajimine*, 39 Haw. at 550, and determined that the stated public purpose in Resolution No. 31–03, *i.e.*, to build a bypass road, was *not* "only incidental" or a mere "pretextual public benefit[ ]" to hide the predominantly private benefit of the bypass road to Oceanside. Moreover, the majority's conclusion that the trial court "erred in declining to expressly examine the pretext issue in Condemnation 2," *Coupe* Majority Opinion at 389, 198 P.3d at 652, appears to rest on the fact that the trial court did not, as previously indicated, use the specific word "pretext" or "pretextual" in its written decision. However, the trial court specifically concluded that "*there [was] sufficient attenuation between the [d]evelopment [a]greement* previously mentioned and [Resolution No. 31–03]." (Emphasis added.) Logically, inasmuch as the trial court concluded that Condemnation 2 was "sufficient[ly] attenuat[ed]" from the development agreement, it follows that the trial court also believed that the development agreement was not the "actual purpose" of Condemnation 2.[6]

The majority seems troubled by the fact that Oceanside received a benefit from Condemnation 2 (*i.e.*, the zoning change and access to its property via the bypass road). However, the fact that Oceanside received a

---

6. The majority's analysis seemingly centers in part around its belief that "it is not apparent from the record whether any or all of the same provisions in the [development a]greement that led the court to invalidate Condemnation 1 were still in effect and underlay Condemnation 2, or whether other conditions existed such that the private character predominated." *Coupe* Majority Opinion at 383, 198 P.3d at 646 (footnote omitted). As stated above, the trial court determined that Condemnation 1 illegally delegated condemnation authority to Oceanside, and never reached the issue in Condemnation 1 whether the construction of the bypass road was a valid public purpose nor whether it was a mere pretext

for the actual purpose. Indeed, as indicated by the majority, "courts generally speak of illegal delegation and public purpose as two distinct considerations. Either illegal delegation, or lack of a valid public purpose, will invalidate a taking." *Id.* at 381–82, 198 P.3d at 644–45 n. 34 (emphasis omitted). Moreover, during closing arguments at trial, the appellants maintained that "the delegation issue . . . [stood] apart from the public purpose." Thus, I fail to see how the issue of illegal delegation relates to whether "the asserted purpose of the taking is a 'mere pretext' for an actual purpose to bestow a private benefit," *Goldstein I*, 488 F.Supp.2d at 286 (quoting *Kelo*, 545 U.S. at 478, 125 S.Ct. 2655).

private benefit from Condemnation 2 does not automatically dictate that the undisputed public purpose of the bypass road was a mere pretext. In this regard, the following statement by the United States Court of Appeals for the Second Circuit is instructive:

> We do not read *Kelo's* reference to "pretext" as demanding, as the appellants would apparently have it, a full judicial inquiry into the subjective motivation of every official who supported the [taking], an exercise as fraught with conceptual and practical difficulties as with state-sovereignty and separation-of-power concerns. Beyond being conclusory, the claim that the "decision to take Plaintiffs' properties serves only one purpose" defies both logic and experience. "Legislative decisions to invoke the power to condemn are by their nature political accommodations of competing concerns." *Brody v. Vill. of Port Chester,* 434 F.3d 121, 136 (2d Cir.2005). And as Justice Scalia observed in words, if anything, more pertinent in this case:

> > [W]hile it is possible to discern the objective "purpose" of a statute (*i.e.,* the public good at which its provisions appear to be directed) ... discerning the subjective motivation of [a legislative body] is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed even finite.... To look for the sole purpose of even a single legislator is probably to look for something that does not exist.

> *Edwards v. Aguillard,* 482 U.S. 578, 636–37[, 107 S.Ct. 2573, 96 L.Ed.2d 510] (1987) (Scalia, J., dissenting) (emphasis in original). Thus, while "a legislature may juggle many policy considerations in deciding whether to condemn private property," the task of a ... court reviewing the constitutionality of such a taking should be one of "patrolling the borders" of this decision, viewed objectively, not second-guessing every detail in search of some illicit improper motivation. *See Brody,* 434 F.3d at 135.

We reach this conclusion preserving the possibility that a fact pattern may one day arise in which the circumstances of the approval process so greatly undermine the basic legitimacy of the outcome reached that a closer objective scrutiny of the justification being offered is required. In this area, "hypothetical cases ... can be confronted if and when they arise." *Kelo,* 545 U.S. at 487[, 125 S.Ct. 2655]; *see also id.* at 487 n. 19[, 125 S.Ct. 2655]. But we hold today that where, as here, a redevelopment plan is justified in reference to several classic public uses whose objective basis is not in doubt, we must continue to adhere to the *Midkiff* standard, *i.e.,* that the [taking]:

> > may not be successful in achieving its intended goals. But "whether in fact the [taking] will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if ... the ... [state] rationally could have believed that the [taking] would promote its objective."

> *Midkiff,* 467 U.S. at 242[, 104 S.Ct. 2321].

*Goldstein II,* 516 F.3d at 63–64 (some brackets in original and some added) (some citations omitted).

Like the court in *Goldstein II,* I would hold that inasmuch as the bypass road in this case is a classic public use (recognized in the Kona Regional Plan) "whose objective basis is not in doubt," there was no need for a "full judicial inquiry into the subjective motivation of every official who supported the [taking]," *id.* at 63, which inquiry would be "fraught with conceptual and practical difficulties." *Id.* The unchallenged FOFs indicate that the County initiated Condemnation 2 to build a bypass road and that the bypass road served a public purpose. The County may well have had other motivations; however, such motivations, if any, fall outside the scope of a judicial public use inquiry inasmuch as "the power of eminent domain is merely the means to the end.... Once the object[, *i.e.,* the public purpose,] is within the authority of [the government], the means by which it will be attained is also for [the government] to determine." *Midkiff,* 467 U.S. at 240, 104 S.Ct. 2321 (ellipsis in original) (citation omitted).

In sum, the record reflects that the appellants, over the course of the month-long trial, had ample opportunity to prove that the

County's "actual motivation" in condemning the subject property was to provide a private benefit to Oceanside. As reflected in the trial court's FOFs and COLs, they did not do so. Thus, the appellants have failed to meet their burden of showing that Condemnation 2 was "clearly and palpably of a private character," *Ajimine,* 39 Haw. at 550, and that "the legislative facts on which [Resolution No. 31–03] is ... based could not reasonably be conceived to be true by the [County]." *HFDC,* 79 Hawai'i at 86, 898 P.2d at 598 (original emphasis omitted). The majority's remand of this case to the trial court improperly provides the appellants with a second bite at the apple to make "a clear showing [that the taking was] intended to favor [Oceanside]." *Kelo,* 545 U.S. at 491, 125 S.Ct. 2655 (Kennedy, J., concurring). Consequently, I would hold that the trial court, having amply considered the appellants' "pretext" defense, correctly determined that Condemnation 2 served a valid public purpose.

## 2. Rationally Furthers the Public Purpose

Having determined that Condemnation 2 constituted a valid public purpose, I turn next to the issue whether Condemnation 2 rationally furthered such purpose. As stated in Resolution No. 31–03, the public purpose of Condemnation 2 was to build a bypass road. The County also determined that the land sought to be condemned was needed for the construction of such road. Inasmuch as this court will not "second-guess the [government]'s determinations as to what lands its needs to acquire in order to effectuate the project," *Kelo,* 545 U.S. at 488, 125 S.Ct. 2655, I would hold that Condemnation 2 rationally furthered the public purpose of building a bypass road.

## II. *CONCLUSION*

Based on the foregoing, I would conclude that the trial court correctly determined that Condemnation 2 was for a valid public purpose and rationally furthered such purpose. Consequently, I would affirm the trial court's September 27, 2007 first amended final judg-

ment on the issue of the public purpose of Condemnation 2.